**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Ramiro RODRIGUEZ, Defendant–**
**Appellant.**

**No. 91–50243.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted March 3, 1992.

Decided Oct. 5, 1992.

---

Jeanne G. Knight, Asst. Federal Public Defender, San Diego, Cal., for defendant-appellant.

George Aguilar, Asst. U.S. Atty., San Diego, Cal., for plaintiff-appellee.

Before: HUG, PREGERSON, and POOLE, Circuit Judges.

POOLE, Circuit Judge:

### INTRODUCTION

Appellant Ramiro Rodriguez, convicted under 21 U.S.C. § 841(a)(1) of possessing a controlled substance with intent to distribute (168 pounds of marijuana), appeals the denial of his motion to suppress evidence seized after an investigatory stop by U.S. Border Patrol Agents. Rodriguez claims that the agents did not have reasonable suspicion to stop his car, and thus conducted an illegal search in violation of the fourth amendment. We agree and reverse the district court's ruling.

### FACTUAL AND PROCEDURAL BACKGROUND

On August 4, 1990, at approximately 7:00 p.m., Rodriguez traveled alone heading west on Interstate 8 in Southern California driving a 1976 Ford Ranchero. Two Border Patrol Agents sat in their marked car parked 20 feet to the side of the highway near the In–Ko–Pah exit. The agents saw Rodriguez approach from a quarter of a mile away. They noted that he looked Hispanic, sat up straight, kept both hands on the wheel, and looked straight ahead. He did not "acknowledge" the agents, which they thought suspicious since, as they testified, "all the other traffic that went by— people had their feet out the window. They had their arms out the window. They were looking at us. They were acknowledging our presence. They were waiving at us, or whatever."

One of the agents testified that he had seen a picture of a vehicle similar to Rodriguez's that had allegedly been involved in another smuggling case at some unknown place and time. The agents also testified that, in their experience, Ford Rancheros have a space behind the seat where aliens can be concealed.

The agents followed Rodriguez. They testified that his car responded sluggishly when it went over a bump as if heavily loaded, rather than with a "crisp, light movement" which they testified was typical for this type of vehicle. They further testified that, while being followed, Rodriguez looked in his rear view mirror and swerved slightly within his lane. Based on these observations, the agents activated their emergency lights to stop Rodriguez. He pulled immediately to the shoulder. A subsequent search of Rodriguez's vehicle resulted in the seizure of 168 pounds of marijuana.

Rodriguez was indicted for violation of Title 21 U.S.C. § 841(a)(1), possession of marijuana with intent to distribute. When the District Court denied his motion to suppress the evidence as being the product of an illegal stop, he entered a conditional plea of guilty and filed this appeal. As a mixed question of law and fact, we review *de novo* whether reasonable suspicion existed for this investigatory stop. *U.S. v. Hernandez–Alvarado*, 891 F.2d 1414, 1416 (9th Cir.1989).

## DISCUSSION

■ The fourth amendment's prohibition of unreasonable searches and seizures extends to seizures of the person, including the brief investigatory stop of a vehicle. *U.S. v. Brignoni–Ponce*, 422 U.S. 873, 878, 95 S.Ct. 2574, 2578–79, 45 L.Ed.2d 607 (1975). Thus, an officer may not detain a motorist without "a particularized and objective basis for suspecting the particular person stopped of criminal activity." *U.S. v. Cortez*, 449 U.S. 411, 417–418, 101 S.Ct. 690, 694–96, 66 L.Ed.2d 621 (1981). This objective basis, or "reasonable suspicion" must consist of "specific, articulable facts which, together with objective and reason-

able inferences, form the basis for suspecting that the particular person detained is engaged in criminal activity." *Hernandez–Alvarado*, 891 F.2d at 1416, *citing U.S. v. Cortez*, 449 U.S. at 416–418, 101 S.Ct. at 694–95.

■ "Reasonable suspicion" is less than probable cause, *U.S. v. Brignoni–Ponce*, 422 U.S. at 880, 95 S.Ct. at 2579–80, and "the facts used to establish 'reasonable suspicion' need not be inconsistent with innocence." *U.S. v. Franco–Munoz*, 952 F.2d 1055, 1057 (9th Cir.1991). However, a finding of reasonable suspicion must be based upon "the degree of suspicion that attaches to particular types of non-criminal acts." *U.S. v. Sokolow*, 490 U.S. 1, 10, 109 S.Ct. 1581, 1587, 104 L.Ed.2d 1 (1989).

■ In the case before us, to determine whether the agents' suspicion was reasonable, we must ascertain under the above guidelines whether the factors they cite as giving rise to the stop describe behavior that should excite the suspicion of a trained border patrol agent that criminal activity is afoot. While the circumstances are to be considered from the perspective of a trained and experienced agent, *Cortez*, 449 U.S. at 418, 101 S.Ct. at 695, mere subjective impressions are never enough and hunch alone cannot be relied upon to transform innocent driving behavior into suspicious activity. *Nicacio v. I.N.S.*, 797 F.2d 700, 705 (9th Cir.1985). Finally, we must be watchful for mere rote citations of factors which were held, in some past situations, to have generated reasonable suspicion, leading us to defer to the supervening wisdom of a case not now before us.

■ The record indicates that the agents relied upon these factors in deciding to stop Rodriguez:

—Interstate 8 is a "notorious route for alien smugglers;"

—Rodriguez, who was alone in his car, did not acknowledge the agents as he passed their marked car while all the other passing traffic honked, waived, or in some way acknowledged their presence;

—Rodriguez's car was a kind Agents thought could be used for alien smuggling;

—While being followed, Rodriguez looked at the Agents several times in his rear view mirror and swerved slightly within his lane;

—Although the Agents saw only Mr. Rodriguez in the car, it appeared to be "heavily loaded" and "kind of floated" over bumps in the road;

—Rodriguez is a Hispanic male.

We note, initially, that this is not the first time Border Patrol agents have tendered a similar profile to this court as evidence of the existence of reasonable suspicion. In fact, this profile is so familiar, down to the very verbiage chosen to describe the suspect, that an inquiring mind may wonder about the recurrence of such fortunate parallelism in the experiences of the arresting agents. Consider, for example, that the Border Patrol agents in *U.S. v. Franco–Munoz* gave this picture:

—The area where the car was stopped was frequently used to transport illegal aliens, described by Agent Vandekop as "notorious for alien smuggling";

—appellant, who was alone in the car, did not acknowledge the agents' presence as he passed their parked patrol car; [The agents were parked in a marked Border Patrol car beside the road. One of the agents testified that drivers generally acknowledge the patrolmen's presence in this type situation.]

—appellant's car had a rental agency sticker on it [rental cars apparently are often used for alien smuggling];

—appellant was stopped at 4:45 p.m., near a change of patrolmen shift. Agent Vandekop testified "there's a lot of smuggling that goes on during shift change";

—while following appellant approximately six car lengths behind, appellant looked at the patrol car in his rear view mirror and his side view mirror several times;

—although there was only one person in the car, it appeared to be "heavily laden," from the way it responded to bumps in the road. Agent Vandekop testified the car suspension was "real sluggish";

—appellant appeared to be of Hispanic origin.

*Franco–Munoz,* 952 F.2d at 1057 (footnotes omitted). The only factor missing from the *Franco–Munoz* list in the instant case is the occurrence of the stop near a change of patrolperson shift.

In *U.S. v. Bugarin–Casas,* 484 F.2d 853 (9th Cir.1973), *cert. denied,* 414 U.S. 1136, 94 S.Ct. 881, 38 L.Ed.2d 762 (1974), the agents tendered substantially the same profile: "[Bugarin's Mexican appearance], the fact that he was alone, the fact that the car was riding low (particularly unusual in that there was only one visible occupant), and the fact that the agents knew that the model car Bugarin was driving was of the sort that had been used to secrete aliens in a floor compartment over the rear axle." *Id.* at 855.

The alleged factual similarities in these cases are troubling. Coincidence is a fortuity; but it does not come so often to the aid even of the most deserving public law enforcement agents. We note, for example, little dispute that a vehicle which contains only one visible occupant, yet appears heavily loaded and responds sluggishly to bumps, might reasonably gain the attention of an experienced border patrol agent. However, when this detail becomes a recurrent theme, an incantation in the agent's "reasonable suspicion" phrase book, its credibility is open to challenge.

In the instant case, it seems rather unlikely that a 16 year-old Ford would handle more sluggishly or ride lower solely because it contained 168 pounds of marijuana (about the weight of a single adult passenger). However, there is at least a question that the agents would genuinely expect such a vehicle ever to respond to bumps with a "crisp, light movement."

Reasonable suspicion must be founded upon a particularized and objective basis for suspecting the *particular person* stopped of criminal activity. For this reason we must not accept what has come to appear to be a prefabricated or recycled profile of suspicious behavior very likely to

sweep many ordinary citizens into a generality of suspicious appearance merely on hunch. This is required by the fourth amendment. The opinions of this court have put the nomenclature of reasonable suspicion into the public domain. We must not allow ourselves to be seduced by the reassuring familiarity of its echo.

We believe that the factors cited here describe too many individuals to create a reasonable suspicion that this particular defendant was engaged in criminal activity. The agents tender to us the picture of innocent driving behavior but ask us to accept it as signifying criminal behavior to a trained and experienced eye. This we cannot do. Innocents, as well as criminals, sometimes keep their hands on the wheel and feet in the vehicle. Innocents, as well as criminals, drive vehicles which are as they are because many people will buy them including a space behind the seat in which a person or luggage might fit. The agents asserted that they had seen a photo of a similar vehicle which had been used in a smuggling operation at some unknown place and time. We may confidently assert that all types of vehicles have been used in smuggling operations at some place. Many people walk across the border; many drive, glancing at a marked police or Border Patrol car; that such a shift of attention from the roadway to the police presence might cause a vehicle to veer off is hardly a whistle siren of misconduct. Although factors consistent with innocent travel might, when taken together, amount to reasonable suspicion, *see Sokolow*, 490 U.S. at 1, 109 S.Ct. at 1581, such is not the case given these facts.

In short, the agents in this case saw a Hispanic man cautiously and attentively driving a 16 year-old Ford with a worn suspension, who glanced in his rear view mirror while being followed by agents in a marked Border Patrol car. This profile could certainly fit hundreds or thousands of law abiding daily users of the highways of Southern California.

At stake in this case is the "right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law." *Union Pac. R. Co. v. Botsford*, 141 U.S. 250, 251, 11 S.Ct. 1000, 1001, 35 L.Ed. 734 (1891). We are not prepared to approve the wholesale seizure of miscellaneous persons, citizens or non-citizens, who are seen driving any place near the Mexican border—driving with caution and circumspection—in the absence of well-founded suspicion based on particular, individualized, and objectively observable factors which indicate that the person is engaged in criminal activity. The agents must be able to articulate how these observations arouse the belief that criminality is afoot. Because the profile tendered by the agents to justify their stop of Rodriguez is calculated to draw into the law enforcement net a generality of persons unmarked by any really articulable basis for reasonable suspicion, even if that hunch should prove true as in this case, we hold that this stop constituted an illegal seizure and the conviction is REVERSED.