UNITED STATES of America,
Plaintiff–Appellee,

v.

Eduardo A. GARCIA–CAMACHO,
Defendant–Appellant.

UNITED STATES of America,
Plaintiff–Appellee,

v.

Jose Jesus GUTIERREZ–ROSALES,
Defendant–Appellant.

Nos. 94–10162, 94–10189.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Feb. 13, 1995.

Decided April 17, 1995.

Salvatore Sciandra, Fresno, CA, for defendant-appellant Garcia–Camacho.

Ann Hardgrove Voris, Asst. Federal Public Defender, Fresno, CA, for defendant-appellant Gutierrez–Rosales.

Karen A. Kalmanir, Asst. U.S. Atty., Fresno, CA, for plaintiff-appellee.

Before: TANG and O'SCANNLAIN, Circuit Judges, and MERHIGE, Jr.,* District Judge.

TANG, Senior Circuit Judge:

Defendant Eduardo Garcia–Camacho. and Defendant Jose Jesus Gutierrez–Rosales appeal the denial of their motions to suppress evidence seized after an investigatory stop by U.S. Border Patrol Agents. Defendants claim the agents did not have reasonable suspicion to stop their pickup truck and thus conducted an illegal search and seizure in violation of the Fourth Amendment. The district court held an evidentiary hearing and denied defendants' motions to suppress. Defendants subsequently pleaded guilty under 21 U.S.C. §§ 841(a)(1) and 846 to conspiring to manufacture methamphetamine. We have jurisdiction under 28 U.S.C. § 1291 and we reverse.

---

* Honorable Robert R. Merhige, Jr., Senior District Judge for the District of Virginia, sitting by designation.

## BACKGROUND

On September 27, 1993 at approximately 7:30 a.m., Border Patrol Agent Bernardo Madrid observed a Chevrolet pickup truck with a camper top travelling northbound on Interstate 5 near Grapevine, California. Grapevine is located approximately 300 miles from the United States–Mexico border. Defendant Garcia–Camacho drove the truck and defendant Gutierrez–Rosales was his passenger. At the time of the observation, Agent Madrid and his partner, Neil Jensen, were on the side of the highway and were in the process of unloading eleven undocumented aliens from a van that they had stopped approximately five to eight minutes prior to observing defendants' truck.

When Madrid first noticed the truck, it was in the far left-hand lane, three lanes away from him, and it was going a little faster than the flow of traffic. The truck made a lane change when it passed Madrid's location. Madrid testified that defendants stared straight ahead as they passed him, but that shortly thereafter, defendant Gutierrez–Rosales turned around and looked toward him. Madrid testified that the look on Gutierrez–Rosales' face was one of "surprise," and the kind of look that "illegal aliens get when they are about to run." Madrid further testified that the truck started to accelerate shortly after passing him.

Based on these observations, and his belief that Interstate 5 was "the fastest route to economic opportunities," Madrid became suspicious that illegal aliens were being transported in the truck bed. Madrid and Jensen entered their Border Patrol car and proceeded to follow the truck. While following the truck, Madrid noticed the truck was heavily ladened and was reacting to bumps similarly to the van that he had just stopped. The agents believed they had reasonable suspicion at this time that the defendants were transporting illegal aliens, so they turned on their emergency lights. The truck "slowed to normal freeway speed, but continued on for some distance"—approximately one to one-and-a-half miles—before pulling over.

When Madrid and his partner approached the truck, they noticed several gray five gallon containers, sacks of chemicals, and a gas cylinder in the truck bed. The agents recognized the equipment as those used in manufacturing methamphetamine. The agents then approached Garcia–Camacho and Gutierrez–Rosales and asked them about their citizenship and place of birth. When the defendants said they were illegal aliens, the agents arrested them.

In addition to the methamphetamine manufacturing equipment, the agents also found in the front seat of the truck a nine millimeter handgun, papers indicating Gutierrez–Rosales' ownership of the gun, and a bag of red phosphorous.[1] The defendants moved to suppress this evidence—consisting of the gun, papers indicating defendant Gutierrez–Rosales' ownership of the gun, the red phosphorous, defendants' statements to the agents, and the methamphetamine manufacturing equipment—on the ground that the agents lacked reasonable suspicion to stop defendants' truck.

The district court held an evidentiary hearing and denied defendants' motions to suppress. The court stated that "the testimony of [Agent Madrid] makes it clear that he had articulable suspicions based upon the facial expression of the passenger when he made eye contact and based upon the heavy load apparently concealed in the truck bed."

As a "mixed question of law and fact, we review *de novo* whether reasonable suspicion existed for the investigatory stop." *United States v. Rodriguez*, 976 F.2d 592, 594 (9th Cir.1992) opinion amended on denial of rehearing by 997 F.2d 1306 (9th Cir.1993) (amendments not relevant to the discussion). We conclude the agents did not have reasonable suspicion.

## DISCUSSION

The Fourth Amendment's prohibition of unreasonable searches and seizures extends to the brief investigatory stop of a vehicle. *United States v. Brignoni–Ponce*, 422 U.S. 873, 878, 95 S.Ct. 2574, 2578–79, 45 L.Ed.2d 607 (1975). An officer may not de-

---

**1.** Red phosphorous is a chemical used to manu-  facture methamphetamine.

tain a motorist without a showing of "reasonable suspicion." *Rodriguez*, 976 F.2d at 594. This "objective basis, or 'reasonable suspicion,' must consist of 'specific, articulable facts which, together with objective and reasonable inferences, form the basis for suspecting that the particular person detained is engaged in criminal activity.'" *Id.* (citations omitted). A "gloss on this rule prohibits reasonable suspicion from being based on broad profiles which cast suspicion on entire categories of people without any individualized suspicion of the particular person stopped." *United States v. Rodriguez–Sanchez*, 23 F.3d 1488, 1492 (9th Cir.1994).

## A.

In *Rodriguez*, the court found the following factors insufficient to support a finding of reasonable suspicion:

(1) interstate 8 is a "notorious route for alien smugglers";

(2) defendant did not acknowledge the agents as he passed their marked car;

(3) defendant's car was of a kind agents thought could be used for alien smuggling;

(4) although the agents saw only the defendant in the car, it appeared to be "heavily loaded" and "kind of floated" over bumps in the road;

(5) defendant is a Hispanic male;

(6) while being followed, defendant looked at the agents several times in his rear-view mirror and swerved slightly within his lane.

The court found these factors insufficient because, *inter alia*, the profile tendered by the agents was "calculated to draw into the law enforcement net a generality of persons unmarked by any really articulable basis for reasonable suspicion." *Rodriguez*, 976 F.2d at 596.

In the instant case, Agent Madrid tendered a profile very similar to the profile that was held insufficient in *Rodriguez*:[2]

(1) interstate 5 is the "quickest route to economic opportunities" for illegal aliens;

(2) defendants looked straight ahead and did not acknowledge Agent Madrid or his partner;

(3) Garcia–Camacho's truck was of a kind that Agent Madrid thought could be used for alien smuggling;

(4) the truck appeared heavily ladened based on the way it reacted to bumps;

(5) defendants are Hispanic males;

(6) Garcia–Camacho was driving the truck faster than the flow of traffic, the truck appeared to accelerate as it passed agent Madrid's position, and the truck made a lane change near Madrid's position;

(7) shortly after the truck passed the location of Agent Madrid, the passenger turned toward Madrid with a "surprised" and "terrified" look on his face;

(8) the truck proceeded for "some distance"—around one to one-and-a-half miles—before pulling over;[3]

---

**2.** *Rodriguez* cautioned courts to guard against the "mere rote citations" of similar factors tendered by Border Patrol agents. *Rodriguez*, 976 F.2d at 594. The court stated:

> We note, initially, that this is not the first time Border Patrol agents have tendered a similar profile to this court as evidence of the existence of reasonable suspicion. In fact, this profile is so familiar, down to the very verbiage chosen to describe the suspect, that an inquiring mind may wonder about the recurrence of such fortunate parallelism in the experiences of the arresting agents.

976 F.2d at 595. We, too, are suspicious about the recurrence of such fortunate parallelism. We find the following cross-examination of Agent Madrid worth noting:

> Q: Now, as part of your training, have you read decisions from the Courts so that you know how to prepare a report and in fact what to look for?

> A: Yes, I have.

> Q: And so you've read court decisions that say that if they don't look at you, perhaps it's suspicious, they're illegal aliens? You've read those?

> A: Yes, sir.

**3.** The government also argues that the agents' stopping of a van that contained undocumented aliens five to eight minutes prior to observing defendants' truck adds to the reasonable suspicion inquiry. We find this contention meritless. There is no evidence that the van was in any way linked to the defendants and there is no evidence that the van and the truck were travelling in tandem. Moreover, hundreds of vehicles may pass by any stationary location on a busy highway within a five to eight minute span. We decline to assume all of these vehicles somehow become suspicious simply because Border Patrol agents stopped a van containing undocumented aliens within the last five to eight minutes.

Here, factors (1) through (5) are virtually identical to the factors that were insufficient in *Rodriguez*. Moreover, factor (2) can no longer be accorded any weight. This court recently stated in *Gonzalez–Rivera v. INS*, 22 F.3d 1441, 1446 (9th Cir.1994), that "[u]nder Ninth Circuit law, a driver's failure to look at the Border Patrol cannot weigh in the balance of whether there existed reasonable suspicion for a stop." The court stated:

> A driver's failure to look at the border patrol car [cannot be used to justify the agent's suspicion] since the opposite reaction, a driver's repeated glancing at a Border Patrol car, can also be used to justify the agent's suspicion. To give weight to this type of justification "would put the officers in a classic 'heads I win, tails you lose' position [and] the driver, of course, can only lose."

*Id.* at 1447 (citation omitted).

The remaining factors add little or nothing to the government's case. Factor (6), like factor (2) above, falls into the classic "heads I win, tails you lose" trap. The government here argues that going faster than the flow of traffic and accelerating after passing Agent Madrid's position is suspicious. In *United States v. Hernandez–Alvarado*, 891 F.2d 1414 (9th Cir.1989), however, the government argued that the *"reduction* in speed from 65 to 55 m.p.h." constituted suspicious conduct. *Id.* at 1418 (emphasis added).[4] Presumably, the only nonsuspicious conduct would be if the driver kept constant speed while passing a Border Patrol car.[5] No circuit has yet demanded such exactness in driving.

Moreover, it is perfectly consistent with innocent driving that a driver might slow down near a Border Patrol car because other drivers are slowing down, pass the slower drivers, and then speed up once the driver has passed the scene. *See U.S. v. Robert L.,* 874 F.2d 701, 703–04 (9th Cir.1989) (leaving scene of accident at a "quicker pace" than other traffic and later "swerv[ing]" from the left lane into the right is only *de minimis* deviation from normal driving and did not constitute reasonable suspicion). In this case, Garcia–Camacho changed lanes to avoid hitting the slower car in front of him[6] and accelerated once he passed the Border Patrol car at the side of the road. In addition, no traffic laws were broken. Although not breaking any traffic laws "is not determinative, it is significant." *Robert L.,* 874 F.2d at 704.

The government also argues that Factor (7)—the look of "surprise" and "terror" on Gutierrez–Rosales' face—constitutes suspicious conduct. In *Hernandez–Alvarado,* however, the court placed little weight upon "the nervous demeanor of both the defendant and his passengers as they sat in the truck." *Hernandez–Alvarado,* 891 F.2d at 1418–19. Moreover, Agent Madrid's impressions are entirely subjective and are based on his observation of a passenger's face in a truck that was moving away from him at a high rate of speed. In addition, these subjective impressions changed and fluctuated. His initial impression was that the "occupants upon noticing our vehicle reacted with a look of surprise." At the evidentiary hearing, however, Agent Madrid testified that the look was actually one of terror—"a look that most undocumented aliens give when they're about to take off running." Nevertheless, Agent

---

4. The *Hernandez–Alvarado* court found the following six factors insufficient to constitute reasonable suspicion: "(1) the nervous demeanor of both the defendant and his passengers as they sat in the truck; (2) the reduction in speed from 65 to 55 m.p.h.; (3) the presence of a two-way antenna on the trunk of the vehicle; (4) defendant's residence in a neighborhood on the U.S.-Mexican border which was under investigation for narcotics activity; (5) the license plate bracket indicating that the car had been purchased from a dealership associated with drug trafficking; and (6) the size of defendant's trunk." 891 F.2d at 1418.

5. It is not difficult to imagine the government one day arguing that driving at constant speed constitutes suspicious conduct because the best way to evade Border Patrol agents is not to stand out by going faster or slower than the normal flow of traffic; rather, it is to blend into the traffic. *Cf. Hernandez–Alvarado,* 891 F.2d at 1419 (noting that the Border Patrol agent considered travelling in the morning suspicious because "drug smugglers travel at that time to *blend in* with the work force") (Alarcon, J., concurring) (emphasis added).

6. The record reveals that Garcia–Camacho changed lanes toward, not away from, Agent Madrid's position.

Madrid conceded that the look could also be the look that some people have if they think they are driving over the speed limit.

Although the facts "are to be interpreted in the light of a trained officer's experience," they must be "more than the mere subjective impressions of a particular officer." *Hernandez–Alvarado*, 891 F.2d at 1416. Giving more than scant weight to Agent Madrid's subjective impressions would allow Border Patrol agents to seize cars simply because they do not like the look on the occupant's face. Such broad discretion would be especially dangerous because the law expressly allows Border Patrol agents to take an individual's race into account in determining whether to restrain that individual's freedom and, as a result, any abuse or overreaching may disparately impact minorities.[7] Agent Madrid's changing subjective impressions thus provide *de minimis* support for the government's position.

Finally, the government argues that the defendants attempted to "evade" the Border Patrol by accelerating after passing Agent Madrid's location and not slowing down for "some distance"—approximately one to one-and-a-half miles—after the agents turned on their emergency vehicle lights. In *Rodriguez–Sanchez*, the court found reasonable suspicion primarily because the driver of the vehicle, after noticing that the agents were following him, "abruptly exit[ed] the highway" from an inside lane, cutting off two lanes of cars. *Rodriguez–Sanchez*, 23 F.3d at 1490, 1493. The court stated that this is not " 'the picture of innocent driving behavior' " and "even to laypersons," such behavior would constitute "an attempt to evade contact with law enforcement officials." *Id.* (citation omitted). Here, as noted above, defendants' acceleration upon passing Agent Madrid's initial location is perfectly consistent with innocent driving behavior, and the defendants at no time broke any traffic laws. Moreover, unlike in *Rodriguez–Sanchez*, once the agents turned on their emergency lights, the defendants reduced speed, made no attempt to evade, and did not abruptly

exit the highway. The evidence here simply does not support the government's contention that the defendants attempted to evade contact with law enforcement officials.

## B.

The government argues, however, that the relevant precedent is *United States v. Franco–Munoz*, 952 F.2d 1055 (9th Cir.1991), *cert. denied,* —— U.S. ——, 113 S.Ct. 3015, 125 L.Ed.2d 705 (1993), and that the instant case is indistinguishable from *Franco–Munoz.* We disagree.

The court in *Franco–Munoz* held that the following seven factors constituted reasonable suspicion:

(1) the area where the car was stopped was described as "notorious for alien smuggling";

(2) defendant, who was alone in the car, did not acknowledge the agents' presence;

(3) defendant's car had a car rental agency sticker on it;

(4) defendant was stopped at 4:45 p.m., near a change of patrolmen shift;

(5) while the agents were following defendant approximately six car lengths behind, the defendant looked at the patrol car in his rear view mirror and his side view mirror several times;

(6) although there was only one person in the car, it appeared heavily ladened from the way it responded to bumps on the road;

(7) defendant appeared to the agents to be of Hispanic origin.

*Franco–Munoz,* 952 F.2d at 1057.

Of the seven *Franco–Munoz* factors, however, factor (2) can no longer be taken into account, factors (3) through (5) are simply not present here, and factor (6) is considerably less suspicious in the context of the instant case. As noted in Part II, factor (2)—whether the defendants made eye contact with the agents—can no longer be accorded any weight under *Gonzalez–Rivera. See* 22 F.3d at 1446. Factor (3) is not pres-

---

7. Indeed, in *Gonzalez–Rivera,* the court noted that "Border Patrol officers may use racial stereotypes as a proxy for illegal conduct without being subjectively aware of doing so." 22 F.3d at 1450.

ent because the defendants here were not driving a rental car. Factor (4) is not present because there is no evidence that the agents were in the process of a shift change. Factor (5) is not present because there is no evidence that the defendants looked several times at the patrol car in their rear view mirror and side view mirror.

Finally, the vehicle in *Franco–Munoz* was a car, which appeared heavily ladened even though it had only one passenger in it. Here it is a truck with two passengers and a camper top, all of which contribute to the heavily ladened nature of the vehicle. Moreover, unlike a passenger car, one of the normal uses of a truck is to transport heavy materials. Thus, the heavily ladened aspect of the truck is less suspicious here. Given these factual distinctions, as well as the change in the case law evidenced by *Gonzalez–Rivera*, we find *Franco–Munoz* to be unpersuasive authority in this case.

## CONCLUSION

The reasons articulated above by Agents Madrid and Jensen do not amount to reasonable suspicion. The profile that Agent Madrid tendered, like the profile tendered in *Rodriguez*, "could certainly fit hundreds or thousands of law abiding daily users of the highways of Southern California." *Rodriguez*, 976 F.2d at 596. Like the courts in *Hernandez–Alvarado, Rodriguez,* and *Gonzalez–Rivera*, we are not prepared to "approve the wholesale seizure of miscellaneous persons, citizens or non-citizens" in the absence of "well-founded suspicion based on particular, individualized, and objectively observable factors which indicate that the person is engaged in criminal activity." *Rodriguez*, 976 F.2d at 596; *see also Hernandez–Alvarado*, 891 F.2d at 1418–19; *Gonzalez–Rivera*, 22 F.3d at 1447. While we recognize the difficult task that Border Patrol agents face on a daily basis, we are mindful that we must jealously guard the "'right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and un-

questionable authority of law.'" *See Rodriguez*, 976 F.2d at 596 (citation omitted).

REVERSED.