**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Ralph ARVIZU, Defendant–Appellant.**

**No. 99–10229.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted March 15, 2000

Filed July 7, 2000

Amended Dec. 1, 2000

Victoria A. Brambl, Office of the Federal Public Defender, Tucson, Arizona, for the appellant.

Christina M. Cabanillas, Assistant United States Attorney, Tucson, Arizona, for the appellee.

Before: POLITZ,[1] REINHARDT, and HAWKINS, Circuit Judges.

### ORDER

The Opinion filed July 7, 2000 is amended as follows:

1. 217 F.3d at 1230, immediately following the first full paragraph, insert the following paragraph:

> "'What factors law enforcement officers may consider in deciding to stop and question citizens minding their own business should, if possible, be carefully circumscribed and clearly articulated. When courts invoke multi-factor tests, balancing of interests or fact-specific weighing of circumstances, this introduces a troubling degree of uncertainty and unpredictability into the process; no one can be sure whether a particular combination of factors will justify a stop until a court has ruled on it.' *Montero–Camargo*, 208 F.3d at 1142 (Kozinski, J.

concurring). Thus we attempt here to describe and clearly delimit the extent to which certain factors may be considered by law enforcement officers in making stops such as the stop involved here."

2. 217 F.3d at 1230, in the sentence beginning "In reaching our conclusion" at the beginning of the second full paragraph, add the words "in this case" after the words "are neither relevant nor appropriate to a reasonable suspicion analysis. . . ."

3. 217 F.3d at 1231, in the second full paragraph, delete the first sentence which begins "As we have previously held," and replace it with the following:

> "As we have previously held, 'factors that have such a low probative value that no reasonable officer would have relied on them to make an investigative stop must be disregarded as a matter of law.' *Montero–Camargo*, 208 F.3d at 1132 (citation omitted)."

4. 217 F.3d at 1231, in the second full paragraph, in the sentence beginning "An examination of four additional factors," replace the words "too fall in this category" with the words "have little or no weight under the circumstances."

5. 217 F.3d at 1233, in the first sentence, add the words "in this case" after the words "are *not* relevant. . . ."

With those amendments, the panel has voted unanimously to deny the Petition for Rehearing; Judges Reinhardt and Hawkins have voted to deny the Petition for Rehearing En Banc, and Judge Politz has so recommended. The full court was advised of the Petition for Rehearing En Banc, and no judge of the court has requested a vote on that petition. Fed. R.App. P. 35.

The Petition for Rehearing and Petition for Rehearing En Banc are DENIED.

---

1. The Honorable Henry A. Politz, Senior United States Circuit Judge for the Fifth Circuit

Court of Appeals, sitting by designation.

## OPINION

REINHARDT, Circuit Judge:

Ralph Arvizu appeals from the district court's denial of his motion to suppress marijuana found in his van by a border patrol agent. Arvizu raises two issues before this court: first, whether the stop of his van by a Border Patrol agent was justified by reasonable suspicion; and second, whether he validly consented to the subsequent search of his van. Because the district court erred in finding that the stop was justified by reasonable suspicion, we reverse.

## 1. *Factual Background*

The events in question took place on the afternoon of January 19, 1998 on Leslie Canyon Road near Douglas, Arizona. Leslie Canyon Road is a largely unpaved, flat, and well-maintained road in the Coronado National Forest that parallels Highway 191. The road, which runs north south, begins at Highway 80 and ends at Rucker Canyon Road. Although Border Patrol Agent Stoddard asserted that the road is rarely travelled by anyone other than ranchers and forest service personnel and is "very desolate," at its southern end, it is paved for about ten miles, and there are residences on both sides.[2] Moreover, there is a national forest in the area, as well as the Chiricahua National Monument, both of which attract a number of visitors. There are also campgrounds and picnic areas around Rucker Canyon.[3] An investigator for the defense who had lived in Douglas for four years testified that

people who live in Douglas frequently use the area for recreation. There are also a number of communities in the area, and for those heading towards the ones that are situated along the roadway between 191 and 186 from Douglas, driving along Leslie Canyon Road is shorter than driving out to I–191 and driving north.

The Douglas, Arizona border station is located about 30 miles from the border on the highway at the intersection of I–191 and Rucker Canyon Road. The station is not operational every day of the year, although on January 19 it was. On that occasion, Border Patrol Agent Stoddard was working at the Douglas station.[4] At about 2:15 p.m. that afternoon, a sensor alerted him to the fact that a car was travelling north on Leslie Canyon Road.[5] Stoddard testified that this made him suspicious for three reasons: first, the timing-the car passed by around 2 p.m. and officers change shifts at 3 p.m. According to Officer Stoddard, smugglers often try to synchronize their movements with shift changes.[6] Second, cars travelling north sometimes use the surrounding, unpaved roads to bypass the station. Third, another officer had stopped a minivan heading north on that road a month earlier and had found marijuana.

His curiosity piqued, Stoddard drove east on Rucker Canyon Road to intersect with Leslie Canyon Road. As he drove, he received another report of sensor activity, indicating that the vehicle was heading west on Rucker from Leslie Canyon. Af-

---

2. There are also homes around the nearby Hunt Canyon, "all along" Highway 191 and along the road leading to the Chiricahua National Monument. The community of Sunizona, with schools and homes, is also on I–191.

3. In particular, there is a Boy Scouts camp around Rucker Canyon, and a number of people use the area for biking.

4. At the suppression hearing, Stoddard testified that he had been assigned to the Douglas station for over two years. He estimated that he found illegal aliens in approximately 50 stops made while he was on roving patrol during those years. On cross-examination,

however, he admitted that he had never made any drug-related stops in the area.

5. On cross-examination, Stoddard estimated that the sensors went off at least four times in each eight-hour shift. In other words, according to Stoddard, approximately 4380 cars pass by every year. The roughly 50 stops in which Agent Stoddard was involved over a period of two years and in which some violation of the law were found represent approximately 1% of this number.

6. At that time, there were three shift changes a day.

ter Stoddard passed Kuykendall Road, he noticed a Toyota minivan approaching him in a cloud of dust. Stoddard proceeded to pull over to the side of the road to observe the minivan as it approached. Although he did not have a radar gun, the agent guessed that the van was travelling at 50 to 55 miles per hour when he first spotted it. According to Stoddard, the minivan slowed as it neared his car. In the minivan was Ralph Arvizu, accompanied by his sister, Julie Reyes, and her three children-Julisa, Renato, and Guillermo.

As the Toyota passed, Stoddard observed the two adults in the front, and three children in the back. According to Stoddard, the driver appeared rigid and nervous. Stoddard based this conclusion on the fact that Arvizu had stiff posture, kept both hands on the steering wheel, and did not acknowledge him. According to Stoddard, this was unusual because drivers in the area habitually "give us a friendly wave." Stoddard also noticed that the knees of the two children sitting in the very back seat were higher than normal, as if their feet were resting on some object placed below the seat.

As the minivan passed, Stoddard decided to follow it. As he did, the children began to wave. According to Stoddard, this seemed odd because the children did not turn around to wave at him; rather, they sat in their seats and continued to face forward. The "waving" continued off and on for about four to five minutes. Based on this, Stoddard believed that the children had been instructed to wave at him by the adults in the front seat.

As the two cars approached the intersection with Kuykendall Road, Stoddard noticed that the Toyota's right turn signal was flashing. It was turned off briefly, but was turned on again shortly before the intersection. The Toyota then turned on to Kuykendall, an action which Stoddard also found suspicious because Kuykendall was the last road a car would take to avoid the border station on Highway 191. (Stod-

dard also found it suspicious that he did not recognize the vehicle in question, although he conceded that tourists visited the area to see the forest and national monument.)

At this point, Stoddard ran a vehicle registration check and discovered that the van's license plates were valid, and that the car was registered to Leticia Arvizu at 403 4th Street in Douglas, Arizona. At the suppression hearing, Stoddard testified that the neighborhood in which 403 4th Street was located was "one of the most notorious areas" for drug and alien smuggling.[7]

On cross-examination, Stoddard conceded that he had no information about smuggling activities either at 403 4th Street in particular or on the part of Leticia Arvizu, in whose name the minivan was registered.

At this point, Stoddard decided to stop the van. As he approached the driver's side, he noticed that there was something underneath the children's feet. As Stoddard approached the Toyota, Arvizu leaned out the window and said "Good morning, officer. How are you doing?" According to Stoddard, Arvizu appeared nervous, and did not remember the name of the park to which he was driving. When Stoddard asked Arvizu about his citizenship, Arvizu replied that he was in fact an American citizen, as were all of the minivan's occupants. When Stoddard asked if Arvizu had anything or anyone hidden in the van, Arvizu said no. Nevertheless, Stoddard asked if he could look around the van, a request which Arvizu said he interpreted as a request to look around the outside of the vehicle, not to look inside. (At the suppression hearing, both Arvizu and his sister testified that Stoddard had his hand on his gun when he approached the vehicle and asked to look around. Stoddard denied this.) Stoddard did not tell Arvizu that he had a right to refuse, nor did he read Arvizu his *Miranda* rights. When

---

**7.** On cross-examination, Stoddard explained that the "general area" was one in which aliens were often stashed before being transported north.

Arvizu agreed to let Stoddard look around, the agent walked around to the passenger's side and opened the sliding door. Stoddard testified that as he did so, he saw a black duffel bag and smelled marijuana. Stoddard proceeded to open the bag and discovered marijuana inside.

Arvizu was charged with possession with intent to distribute marijuana, in violation of 21 U.S.C. § 841(a)(1). At a suppression hearing, Arvizu argued first, that Stoddard did not have reasonable suspicion to stop the minivan, and second, that he did not give voluntary consent to the search of his van. The district court rejected both arguments and denied the motion to suppress. Arvizu then entered a conditional guilty plea, under which he reserved the right to appeal the denial of his motion to suppress. This appeal followed.

## 2. Legal Background

■■■ In order to satisfy the Fourth Amendment's strictures, an investigatory stop may be made only if the officer in question has "a reasonable suspicion supported by articulable facts that criminal activity may be afoot...." *United States v. Sokolow*, 490 U.S. 1, 7, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989) (internal quotation omitted) (citing *Terry v. Ohio*, 392 U.S. 1, 30, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)). In determining whether reasonable suspicion exists, we must take into account the totality of the circumstances. *Sokolow*, 490 U.S. at 7–8, 109 S.Ct. 1581 (quoting *Illinois v. Gates*, 462 U.S. 213, 232, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983)). At the same time, however, factors that have so

little probative value that no reasonable officer would rely on them in deciding to make an investigative stop must be disregarded. *Gonzalez–Rivera v. INS*, 22 F.3d 1441, 1446 (9th Cir.1994).

■■■ Although the level of suspicion required for a brief investigatory stop is less demanding than that required to establish probable cause, the Fourth Amendment requires an objective justification for such a stop. *Sokolow*, 490 U.S. at 7, 109 S.Ct. 1581. Thus, the Supreme Court has held that reasonable suspicion does not exist where an officer can articulate only "an 'inchoate and unparticularized suspicion or 'hunch' of criminal activity.'" *Illinois v. Wardlow*, 528 U.S. 119, 124, 120 S.Ct. 673, 676, 145 L.Ed.2d 570 (2000). Rather, reasonable suspicion exists only when an officer is aware of specific, articulable facts which, when considered with objective and reasonable inferences, form a basis for *particularized* suspicion.[8] *United States v. Cortez*, 449 U.S. 411, 418, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981); *United States v. Salinas*, 940 F.2d 392, 394 (9th Cir.1991). In turn, particularized suspicion means a reasonable suspicion that *the particular person being stopped* has committed, or is about to commit, a crime. *Cortez*, 449 U.S. at 418, 101 S.Ct. 690.

■■■ At times, conduct that may be entirely innocuous when viewed in isolation may nevertheless properly be considered in determining whether or not reasonable suspicion exists. *Sokolow*, 490 U.S. 1, 10, 109 S.Ct. 1581 (citations and footnotes omitted) (citing *Illinois v. Gates*, 462 U.S.

---

**8.** In *Brignoni–Ponce*, the Court listed factors which officers might permissibly take into account in deciding whether reasonable suspicion exists to stop a car. Those factors include: (1) the characteristics of the area in which they encounter a vehicle; (2) the vehicle's proximity to the border; (3) patterns of traffic on the particular road and information about previous illegal border crossings in the area; (4) whether a certain kind of car is frequently used to transport contraband or concealed aliens; (5) the driver's "erratic behavior or obvious attempts to evade officers;" and (6) a heavily loaded car or an unusual

number of passengers. *United States v. Brignoni–Ponce*, 422 U.S. 873, 884–885, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975). We note, however, that reasonable suspicion is not a numbers game. Different factors have varying levels of significance, depending on their context. *See Montero–Camargo*, 208 F.3d at 1130, n. 12; *see also Sokolow*, 490 U.S. at 10, 109 S.Ct. 1581. Thus, where a stop is based upon a number of factors, each of which carries only minimal probative weight, quantity does not necessarily make up for the lack of quality.

213, 243–44, n. 13, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983)). Put another way, "conduct that is not necessarily indicative of criminal activity may, in certain circumstances, be relevant to the reasonable suspicion calculus." *United States v. Montero–Camargo,* 208 F.3d 1122, 1130 (9th Cir. 2000) (en banc); *Wardlow,* 528 U.S. at 125, 120 S.Ct. at 677. At the same time, innocuous conduct does *not* justify an investigatory stop unless other information or surrounding circumstances of which the police are aware, considered together with the otherwise innocent conduct, provides sufficient reason to suspect that criminal activity either has occurred or is about to take place. *Guam v. Ichiyasu,* 838 F.2d 353, 355 (9th Cir.1988).

■ In all circumstances, law enforcement officials are entitled to assess the facts in light of their experience. *Brignoni–Ponce,* 422 U.S. at 885, 95 S.Ct. 2574. Nevertheless, "[w]hile an officer may evaluate the facts supporting reasonable suspicion in light of his experience, experience may not be used to give the officers unbridled discretion in making a stop." *Nicacio v. INS,* 797 F.2d 700, 705 (9th Cir.1986), *overruled in part on other grounds in Hodgers–Durgin v. De La Vina,* 199 F.3d 1037, 1045 (9th Cir.1999); *see also United States v. Jimenez–Medina,* 173 F.3d 752, 754 (9th Cir.1999). Thus, while an officer's experience may furnish the background against which the relevant facts are to be assessed as long as the inferences he draws are objectively reasonable, *Cortez,* 449 U.S. at 418, 101 S.Ct. 690, experience is not an independent factor in the reasonable suspicion analysis. *Montero–Camargo,* 208 F.3d at 1131–32.

### 3. *Analysis*

In finding that the stop by Agent Stoddard was justified by reasonable suspicion, the district court relied on the following list of factors: 1) smugglers used the road in question to avoid the border patrol station; 2) Arvizu drove by within an hour of a Border Patrol shift change; 3) a minivan stopped on the same road a month earlier contained drugs; 4) minivans are among the types of vehicles commonly used by smugglers; 5) the minivan slowed as it approached the Border Patrol vehicle; 6) Arvizu appeared rigid and stiff, and did not acknowledge the officer; 7) the officer did not recognize the minivan as a local car; 8) the children's knees were raised, as if their feet were resting on something on the floor of the van; 9) the children waved for several minutes but not towards the officer; and 10) the van was registered to an address in a neighborhood notorious for smuggling. Based on these factors, the district court concluded that reasonable suspicion did exist. We disagree.

■ "What factors law enforcement officers may consider in deciding to stop and question citizens minding their own business should, if possible, be carefully circumscribed and clearly articulated. When courts invoke multi-factor tests, balancing of interests or fact-specific weighing of circumstances, this introduces a troubling degree of uncertainty and unpredictability into the process; no one can be sure whether a particular combination of factors will justify a stop until a court has ruled on it." *Montero–Camargo,* 208 F.3d at 1142 (Kozinski, J. concurring). Thus we attempt here to describe and clearly delimit the extent to which certain factors may be considered by law enforcement officers in making stops such as the stop involved here.

In reaching our conclusion, we find that some of the factors on which the district court relied are neither relevant nor appropriate to a reasonable suspicion analysis in this case, and that the others, singly and collectively, are insufficient to give rise to reasonable suspicion. We begin by considering the factors the district court improperly relied on, before turning to those which it properly took into account.

■ One of the factors on which the district court relied—namely, the fact that the minivan slowed as it approached the Border Patrol vehicle—is squarely prohibited by our precedent. *United States v.*

*Montero–Camargo,* 208 F.3d at 1136; *United States v. Garcia–Camacho,* 53 F.3d 244, 247 (9th Cir.1995). We note that Agent Stoddard never claimed that Arvizu broke any traffic laws. Nor, for that matter, did he assert that Arvizu drove erratically or evasively. Rather, Arvizu simply slowed down. As we have previously noted, slowing down after spotting a law enforcement vehicle is an entirely normal response that is in no way indicative of criminal activity. *Id.* at 247; *United States v. Hernandez–Alvarado,* 891 F.2d 1414, 1419 (9th Cir.1989).

■■■■■ A second factor relied on by the district court, Arvizu's failure to acknowledge Agent Stoddard, is of "questionable value ... generally"[9] and carries weight, if at all, only under special circumstances. *See Hernandez–Alvarado,* 891 F.2d at 1419 n. 6 ("avoidance of eye contact has been deemed an inappropriate factor to consider unless special circumstances make innocent avoidance of eye contact improbable") (internal quotations omitted). As we have held previously, a failure to acknowledge a law enforcement officer by look or gesture, while possibly indicating a lack of neighborliness, ordinarily does not provide a basis for suspecting criminal activity. *Garcia–Camacho,* 53 F.3d at 247; *Gonzalez–Rivera,* 22 F.3d at 1446. Although we have held that the lack of eye contact may be considered under *some* circumstances, we have always treated that factor with appropriate "skepticism" because "reliance upon 'suspicious' looks [or, as the case may be, the failure to look] can ... easily devolve into a case of damned if you do, equally damned if you don't." *Montero–Camargo,* 208 F.3d at 1136; *see also Gonzalez–Rivera,* 22 F.3d at 1446–47; *Nicacio,* 797 F.2d at 704; *United States v. Mallides,* 473 F.2d 859, 861 n. 4 (9th Cir.1973) (collecting cases). Because no "special circumstances" rendered "innocent avoidance ... improbable," Arvizu's failure to acknowledge Stoddard's presence by waving, or by indicating some other form of recognition, *Hernandez–Alvarado,* 891 F.2d at 1419 n. 6, provides no support for Stoddard's reasonable suspicion determination.

■■■■■ For similar reasons, we find that the children's conduct carries no weight in the reasonable suspicion calculus. If every odd act engaged in by one's children while sitting in the back seat of the family vehicle could contribute to a finding of reasonable suspicion, the vast majority of American parents might be stopped regularly within a block of their homes. More to the point, if a driver's failure to wave at an officer provides no support for a determination to stop a vehicle, it would be incongruous to say that the vehicle could be stopped because children who were passengers in the car did wave. *See, e.g., Garcia–Camacho,* 53 F.3d at 247.

■■■■■ As we have previously held, "factors that have such a low probative value that no reasonable officer would have relied on them to make an investigative stop must be disregarded as a matter of law." *Montero–Camargo,* 208 F.3d at 1132 (citation omitted). An examination of four additional factors-namely, the third, seventh, eighth, and tenth-demonstrate that they have little or no weight under the circumstances. The fact that one minivan stopped in the past month on the same road contained marijuana is insufficient to taint all minivans with suspicion. (In contrast, as we discuss below, evidence that in the Border Patrol's experience, minivans are sometimes used by smugglers may be of *some* probative value, because the inference arises from more than a single, isolated incident.)

■■■■■ The fact that the officer did not recognize the minivan as belonging to a local resident also fails to contribute to the reasonable suspicion calculus. Evidence introduced at the suppression hearing made it clear that the area in question is

---

**9.** *Montero–Camargo,* 208 F.3d at 1136 (quoting *United States v. Munoz,* 604 F.2d 1160, 1160 (9th Cir.1979) (per Kennedy, J.)).

one that is used for many purposes by different kinds of people-local residents use the roads as a shortcut, while both residents and tourists alike camp, hike, bike, picnic, and visit the local forest and national monument. Accordingly, it is hardly surprising that a Border Patrol agent would not recognize every passing car.

 Similarly, the fact that a van is registered to an address in a block notorious for smuggling is also of no significance and may not be given any weight. *See United States v. Jimenez–Medina*, 173 F.3d 752, 755 (9th Cir.1999) (holding that "coming from the wrong neighborhood" does not give rise to reasonable suspicion). In arriving at this conclusion, we first consider the cases which involve an individual's presence in a high crime area. The rule that controls such cases is that presence in a high crime area is not enough in and of itself to give rise to reasonable suspicion, *Brown v. Texas*, 443 U.S. 47, 52, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979), but "officers are not required to ignore the relevant characteristics of a location" when an individual's conduct, if considered in the context of that location, gives rise to reasonable suspicion that a crime has been or is being committed. *Wardlow*, 528 U.S. at 124, 120 S.Ct. at 676 (quoting *Adams v. Williams*, 407 U.S. 143, 144, 147–48, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972)). In contrast, where a person lives is an entirely different matter, and one's place of residence is simply not relevant to a determination of reasonable suspicion. Otherwise, persons forced to reside in high crime areas for economic reasons (who are frequently members of minority groups) would be compelled to assume a greater risk not only of becoming the victims of crimes but also of being victimized by the state's efforts to prevent those crimes-because their constitutional protections against unreasonable intrusions would be significantly reduced.

Moreover, in *Montero–Camargo*, we cautioned that "courts should examine with care the specific data underlying" the assertion that an area is one in which "particular crimes occur with unusual regularity." [10] *Montero–Camargo*, 208 F.3d at 1138. In this case, the data simply does not withstand that scrutiny. The only evidence in the record to support the "high crime" characterization is Stoddard's assertion that the 400 block was "one of the most notorious areas" for drug and alien smuggling. Agent Stoddard did not explain the factual basis for this assertion, nor did he identify the source of his information. For this reason as well, we conclude that the district court's reliance on this factor was misplaced. *See Montero–Camargo*, 208 F.3d at 1143 (Kozinski, J., concurring in the result) (noting that "[j]ust as a man with a hammer sees every problem as a nail, so a man with a badge may see every corner of his beat as a high crime area").

 Finally, we note that the fact that the children's knees were raised, while consistent with the placement of their feet on packages of illicit substances, is equally (if not more) consistent with the resting of their feet on a cooler, picnic basket, camping gear, or suitcase. In determining whether reasonable suspicion exists, we have considered whether a car appears heavily loaded. *Garcia–Camacho*, 53 F.3d at 245–46; *United States v. Franco–Munoz*, 952 F.2d 1055, 1057 (9th Cir.1991), *overruled in part on other grounds by Montero–Camargo*, 208 F.3d at 1134, n. 22; *United States v. Bugarin–Casas*, 484 F.2d 853 (9th Cir.1973). We have done so where the vehicle was riding low or responded sluggishly to bumps. *Garcia–Camacho*, 53 F.3d at 245; *Franco–Munoz*, 952 F.2d at 1057. In general, however, we have not given that factor much weight, absent other circumstances that warrant attributing particular significance to it.

**10.** As we noted in that case, our citing of the area where the stop took place as a "high crime area" was conditioned on the unique

circumstances of the area-an isolated, uninhabited locale not used for any legitimate purpose.

*Garcia–Camacho,* 53 F.3d at 249 (finding the fact that a truck with two passengers and a camper appeared heavily laden to be of little weight); *United States v. Rodriguez,* 976 F.2d 592, 596 (9th Cir.1992). In this case, moreover, we are faced with an entirely different situation, in which Officer Stoddard first inferred from the fact that the children's knees were raised that their feet were resting on some sort of object. From this, he next inferred that whatever the children were using as a footrest might well be contraband. That a family travelling in a minivan might put objects on the floor of the van and that children might use those objects as a footrest does not seem at all odd to us. In short, we find this factor also to be all too common to be of any relevance.

■ Having considered those factors that are *not* relevant in this case, we must now turn to those that are-namely, that the road was sometimes used by smugglers, that Arvizu was driving on the road near the time that the Border Patrol shift changed, and that he was driving a minivan, a type of car sometimes used by smugglers. Although these factors are indeed both legitimate and probative to *some* degree, *see, e.g., Franco–Munoz,* 952 F.2d at 1057, they are not enough to constitute reasonable suspicion either singly or collectively. *Jimenez–Medina,* 173 F.3d at 752–56; *Rodriguez,* 976 F.2d at 594–96; *Hernandez–Alvarado,* 891 F.2d at 1419–19; *Garcia–Camacho,* 53 F.3d at 247–49.

As the testimony at the suppression hearing made clear, the road in question is used for a number of entirely innocuous purposes-including as a way of getting to camping grounds and recreational areas, and as a shortcut when travelling from one community to another. Thus, the fact that Arvizu's car was using the road is of only moderate significance. Similarly, minivans, although sometimes used by smugglers, are among the best-selling family car models in the United States. Thus,

although, under the applicable case law, the make of the car may be of *some* relevance in determining whether reasonable suspicion exists, it does not carry particular weight here. *United States v. Brignoni–Ponce,* 422 U.S. 873, 885, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975); *United States v. Garcia–Barron,* 116 F.3d 1305, 1307 (9th Cir.1997); *Bugarin–Casas,* 484 F.2d at 855. We also find that the time at which Arvizu drove by the sensors on Leslie Canyon Road, although relevant, *Franco–Munoz,* 952 F.2d at 1057, is of little probative value, especially in the absence of other factors that tend more persuasively to demonstrate evasive behavior. *Jimenez–Medina,* 173 F.3d at 754–55. In this case, Arvizu's car passed by the sensors at around 2:15 p.m., approximately 45 minutes before the scheduled shift change. While it makes sense to us that smugglers might wish to take advantage of shift changes, a car's travelling on a road in the general area of a Border Patrol station three quarters of an hour before the actual shift change does not seem to us to add much to the mix.

Given the above analysis, we hold that the stop by Agent Stoddard was not supported by reasonable suspicion. The next question, then, is whether the illegality of the stop taints the evidence as a result of the search that ensued. We hold that it does.

■ Under the Fourth Amendment, an illegal stop taints all evidence obtained pursuant to the stop, unless the taint is purged by subsequent events. *United States v. Morales,* 972 F.2d 1007, 1010 (9th Cir.1992); *United States v. Delgadillo–Velasquez,* 856 F.2d 1292, 1299 (9th Cir.1988). Accordingly, in *Florida v. Royer,* 460 U.S. 491, 508, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983), the Supreme Court suppressed the evidence discovered as a result of a search following an illegal stop, even though the police obtained the defendant's consent to the search, because the illegal stop tainted the subsequent consent.[11]

---

**11.** In the context of a confession obtained after an illegal arrest, this court held that, in

order to be admissible, such statements must

 In determining whether the taint of an illegal stop has been purged, "[t]he question we must ask is whether, granting establishment of the primary illegality, the evidence ... has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." *United States v. Millan*, 36 F.3d 886, 890 (9th Cir.1994) (internal quotations omitted). The government bears the burden of showing admissibility. *United States v. Taheri*, 648 F.2d 598, 601 (9th Cir.1981); *United States v. Perez–Esparza*, 609 F.2d 1284, 1290 (9th Cir. 1979).

 Federal courts have invariably found that consents to search at the time of or shortly following an illegal stop of a vehicle are unlawful because the search is tainted by the primary illegality and the taint has not been purged.[12] That makes sense to us. Ordinarily, when a car is illegally stopped, the search that follows will be a product of that stop, as will any consent to that search. Here, the interrogation, consent and search flowed directly from the stop. *United States v. Hernandez*, 55 F.3d 443, 447 (9th Cir.1995); *Millan*, 36 F.3d at 890. No events occurred after the stop that served to purge the subsequent consent and search of the taint. Rather, the officer merely questioned Arvizu, became suspicious because of his answers, and asked for consent. This is a classic case of obtaining evidence through the exploitation of an illegal stop, as is the case in which an officer's suspicions are aroused by what he observes following the stop, and on that basis obtains such consent. Accordingly, we hold that the taint of the illegal stop was not purged by intervening events.

Because we conclude that the stop by Agent Stoddard was not supported by reasonable suspicion and that there were no intervening events that purged the taint of the illegal stop, we reverse the district court's denial of Arvizu's motion to suppress.

REVERSED and REMANDED.

---

not only "meet the Fifth Amendment standard of voluntariness but ... be 'sufficiently an act of free will to purge the primary taint.'" *United States v. Ricardo D.*, 912 F.2d 337, 342 (9th Cir.1990).

12. *See, e.g., United States v. Chan–Jimenez*, 125 F.3d 1324, 1326–27 (9th Cir.1997); *United States v. McSwain*, 29 F.3d 558, 563–64 (10th Cir.1994); *United States v. Chavez–Villarreal*, 3 F.3d 124, 127–28 (5th Cir.1993); *United States v. Valdez*, 931 F.2d 1448, 1452 (11th Cir.1991).