**UNITED STATES of America, Plaintiff–Appellant,**

**v.**

**Burdetto Bernardo GARCIA–ACUNA, Defendant–Appellee.**

No. 98–10375.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted April 12, 1999.

Filed May 4, 1999.

As Amended on Denial of Rehearing and Rehearing En Banc July 19, 1999.

Richard E. Gordon, Assistant United States Attorney, Tucson, Arizona, for the plaintiff-appellant.

Enrique R. Gonzales, Nogales, Arizona, for the defendant-appellee.

Before: BEEZER and TROTT, Circuit Judges, and KING, District Judge.[1]

TROTT, Circuit Judge:

The United States Government appeals a suppression order by the United States District Court for the District of Arizona. The court excluded evidence of marijuana found in the trunk of a car driven by Appellee Garcia–Acuna from his trial for possession with intent to distribute marijuana under 21 U.S.C. § 841(a)(1) (1994). We have jurisdiction under 18 U.S.C. § 3731 (1994 & Supp. I 1995), and we reverse and remand.

I

On the day of Garcia–Acuna's arrest, Border Patrol Agents Ortiz, Brown, and DeRose were patrolling several streets in downtown Nogales, Arizona, including East Street. East Street, which dead-ends approximately 75 to 100 feet from the international border with Mexico, was

**1.** The Honorable Samuel P. King, Senior United States District Judge for the District of Hawaii, sitting by designation.

known to the agents for high levels of traffic in both illegal aliens and narcotics. The border fence near the end of East Street has "numerous holes and sections missing." The agents' assignment was to guard the border against illegal activity.

At the suppression hearing, the government presented the testimony of Agents DeRose and Ortiz. Both were graduates of the Border Patrol Academy and had received training in the laws pertaining to their assignments. Both had also been cross-designated by the U.S. Customs Service to enforce federal narcotics laws.

Agent Ortiz testified to observing four groups walking at different times between the international border and a certain house on East Street. The first group appeared to originate near the border and walked down East Street, but Agent Ortiz was unsure whether the group had crossed the border. Ten to fifteen minutes later, another group left the house and "jumped" the border fence into Mexico. The third group was observed jumping the border fence from Mexico into the United States and walking down East Street before disappearing near the house, and ten to fifteen minutes later, the fourth group left the house and jumped into Mexico. Agent Ortiz did not know whether any one group contained the same people as any other. Because these border crossings were illegal, Agents Ortiz and Brown searched East Street between the house and the border and discovered a burlap sack with twine and plastic bags at the end of East Street. According to Agent Ortiz's testimony, not only is entering the United States without inspection an illegal act, but groups of people conspicuously crossing the border illegally are sometimes used, in his experience, as a diversionary tactic to permit contraband to be smuggled away from the border. Agent DeRose testified also that illegal aliens crossing the border

at that point "get loaded up into vehicles and are driven north."

A brown Ford Explorer was parked in the driveway of the house near where the groups had disappeared, and a red Camaro and a black Chevrolet Celebrity were parked across the street. Agent Ortiz testified to knowing at the time of the arrest about a prior seizure by his agency of the Explorer in connection with narcotics trafficking. He did not recognize the other cars and testified based on his familiarity with the neighborhood ·that they did not "belong to" the area. At one time, a person opened the rear door of the Explorer, but Agent Ortiz did not see that person put anything inside. None of the agents observed anybody approaching the Camaro or the Celebrity.

About an hour after the agents surveilled the last group crossing into Mexico, the Camaro drove down East Street. Agent Brown stopped the Camaro but discovered nothing of interest. An hour later, the Explorer and the Celebrity departed at the same time, with the Explorer preceding the Celebrity down the hill for a block and a half. The Explorer then turned left while the Celebrity continued straight,[2] and Agent Brown followed the Explorer while Agent DeRose followed the Celebrity. The agents' purpose was to look for illegal aliens.

Agent DeRose testified to following the Celebrity at the direction of Agent Ortiz, who was assigned to a van and, under Border Patrol policies, could not participate in the traffic stop. Agent DeRose checked the Celebrity's license plate through a dispatcher in Tucson, who reported that the plate belonged to a Red Cherokee. Agent DeRose stopped the Celebrity, asked for identification, and asked permission to search the car. After discovering the marijuana and arresting Garcia–Acuna, Agent DeRose checked the li-

---

**2.** Agent Ortiz testified this conduct appeared to constitute "tandem driving," where the Explorer was a "heat car" intended to attract the Border Patrol while the Celebrity escaped.

The district court found the block and a half of joint travel too short to establish tandem driving. This finding is not clearly erroneous.

cense plate again and found that it did belong to the Celebrity. He testified this error may have been on his part or the dispatcher's.

## II

■ We review de novo the district court's determination of whether reasonable suspicion existed to support an investigatory stop. *United States v. Michael R.*, 90 F.3d 340, 345–46 (9th Cir.1996). Findings of fact made by the district court as part of its determination are reviewed for clear error. *Id.* at 345.

## III

■■ The Fourth Amendment guards against unreasonable seizures of a person, including brief investigatory stops. *United States v. Cortez*, 449 U.S. 411, 417, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981). An investigatory stop is permissible if specific articulable facts and rational inferences drawn from those facts "reasonably warrant suspicion that the person to be detained may have committed or is about to commit a crime." *United States v. Sutton*, 794 F.2d 1415, 1426 (9th Cir.1986) (citing *Cortez*, 449 U.S. at 417). The suspicion must be particularized to the person stopped. *Cortez*, 449 U.S. at 418 (citing *Terry v. Ohio*, 392 U.S. 1, 21 n. 18, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)).

■ In our recent decision in *United States v. Ordaz*, 145 F.3d 1111 (9th Cir. 1998), we affirmed a finding of reasonable suspicion for an investigatory stop of a vehicle under facts similar to the instant case. In *Ordaz*, Border Patrol Agents observed men carrying packages across the border and down East Street, watched the men put the packages in a vehicle, but were unable to discern the vehicle's make. *Id.* at 1112. With the purpose of looking for contraband, the agents stopped four of six vehicles coming down East Street in the next few minutes, discounting the other two for various reasons. *Id.* One stopped vehicle contained marijuana. *Id.* Because "[t]he Border Patrol had at least

reason to suspect a crime had been committed and to believe that the driver of one of the four cars coming from the area of suspicious activity was carrying out the crime," we found articulable facts leading to reasonable suspicion. *Id.* Likewise, the agents in the case at bar knew that illegal border crossings had taken place in an area where illegal aliens then took vehicles north, and, based on their knowledge of the use of illegal crossings as a diversionary tactic, the agents had reason to suspect other criminal activity. Three vehicles were present in the area continuously from the discovery of the criminal activity and facts giving rise to suspicion of other crimes. Although the agents did not observe criminal conduct specifically involving any of the three vehicles, the agents had reason to suspect each vehicle's involvement in the observed or suspected criminal acts, most notably the illegal border crossings.

We note one particular distinguishing feature between *Ordaz* and the instant case. In *Ordaz*, the facts giving rise to suspicion occurred just before the four vehicles left the area and were stopped. 145 F.3d at 1112. In the instant case, two hours elapsed. We would be reluctant to apply *Ordaz* if the agents had stopped just any car two hours after the suspicious activity. However, because the Camaro, Explorer, and Celebrity were continuously in the immediate vicinity of the crimes from the time the agents first observed an illegal border crossing until the vehicles departed and were stopped, the two-hour delay did not alter the agents' particularized suspicion regarding those vehicles.

Although *Ordaz* itself suggests the outcome of this appeal, in this case an additional factor was present. When Agent DeRose called in the Celebrity's license plate number, the dispatcher informed him that the license plate on the Celebrity belonged to a different car. Because Agent DeRose did not have jurisdiction to enforce traffic laws, the district court discounted the fact of the mismatched plate when evaluating the agent's reasonable suspicion. However, a mismatched plate

can add to suspicion of criminal conduct. *United States v. De Leon–Reyna,* 930 F.2d 396, 400 (5th Cir.1991). In this case, the report of a mismatch turned out to be erroneous. " 'A mistaken premise can furnish grounds for a *Terry* stop, if the officers do not know that it is mistaken and are reasonable in acting upon it.' " *United States v. Shareef,* 100 F.3d 1491, 1505 (10th Cir.1996) (quoting *United States v. Ornelas–Ledesma,* 16 F.3d 714, 718 (7th Cir.1994), *vacated on other gnds.,* 517 U.S. 690 (1996)); *see United States v. Hatley,* 15 F.3d 856, 859 (9th Cir.1994) (holding that the search of a car later determined to be inoperable was reasonable under the "vehicle exception" to the warrant requirement because the officers reasonably believed the car was mobile). Because nothing in the record indicates that either Agent DeRose or the dispatcher acted unreasonably, the district court should have taken the erroneous license report, as well as Agent DeRose's reliance on it, into consideration in determining whether Agent DeRose had the requisite reasonable suspicion for an investigatory stop of the Celebrity.

## IV

Garcia–Acuna urges us to uphold the suppression order on the alternate ground of a lack of consent to search the trunk. Because we do not have a developed record or factual findings by the district court on this issue, we decline to express an opinion on the question of consent.

Accordingly, we **REVERSE** the district court's suppression order and **REMAND** for further proceedings consistent with this opinion.