UNITED STATES of America, Plaintiff–Appellee,

v.

Benjamin J. DIAZ–JUAREZ, Defendant–Appellant.

No. 01–50263.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Feb. 12, 2002.

Filed Aug. 15, 2002.

4. Due to our remand for a new trial, we need not address the government's cross appeal.

Katherine Kimball, San Diego, CA, for the defendant-appellant.

Patrick K. O'Toole, United States Attorney, Mark A. Inciong, Assistant United States Attorney, U.S. Attorney's Office, San Diego, CA, for the plaintiff-appellee.

Before FERGUSON, TASHIMA, and GRABER, Circuit Judges.

Opinion by Judge TASHIMA; Concurrence by Judge GRABER; Dissent by Judge FERGUSON.

## OPINION

TASHIMA, Circuit Judge.

Defendant–Appellant Benjamin Diaz–Juarez ("Diaz") entered a conditional guilty plea to conspiracy to distribute marijuana and methamphetamine, in violation of 21 U.S.C. §§ 846 and 841(a)(1), while reserving his right to appeal. *See* Fed.R.Crim.P. 11(a)(2). He now appeals the district court's denial of his motion to suppress evidence based on an assertedly illegal investigatory stop. We have jurisdiction under 28 U.S.C. § 1291, and we affirm.

## I. BACKGROUND

Shortly after midnight on June 29, 2000, Border Patrol agent Arturo Rodriguez ("Agent Rodriguez"), a four-and-a-half-year Border Patrol veteran, observed Diaz traveling south on Tierra del Sol Road, approximately five miles north of the United States/Mexico border. Agent Rodriguez's suspicions were aroused initially because residents of the local community generally were not out at that time of night. The area also was known for illegal alien crossings and smuggling activity, and there had been reports that large, military-style duffel bags, presumably filled with contraband, were about to be moved north across the border.

Based on this initial suspicion, Agent Rodriguez followed Diaz. While doing so, he noticed that the vehicle was not registered in the area, the rear of the vehicle bounced erratically over small bumps, the rear of the vehicle appeared raised and the suspension modified, and the vehicle was slowing and speeding in a manner suggesting that the driver was unfamiliar with the area.

Agent Rodriguez stopped Diaz approximately one-quarter mile from the border. Diaz admitted that he was an illegal alien and indicated that he was headed to the Makin' Bacon Ranch to look after the owner's pigs. Diaz was taken into custody for processing and voluntary return to Mexico. No inspection of the vehicle or other inquiry into possible drug—or alien—smuggling activity was conducted at that time.

At approximately 6:30 that morning, Agent Rodriguez prepared a "Record of Deportable/Inadmissible Alien," documenting the stop, in which he noted that the Makin' Bacon Ranch is in an area known for smuggling activity. Shortly thereafter, agents seized 269.5 pounds of marijuana at the Makin' Bacon Ranch. While in custody for processing, Diaz implicated himself in a conspiracy to smuggle the marijuana seized at the ranch. Agents then searched Diaz's backpack, finding a glass pipe and five small packages of methamphetamine.

After he was indicted, Diaz moved to suppress evidence, contending that the investigatory stop was illegal. At the suppression hearing, the district court concluded that Agent Rodriguez had reasonable suspicion and denied Diaz's motion. It held that "[t]his officer had every right to stop that vehicle, because he believed based on the totality of the circumstances that criminal activity was afoot."

## II. STANDARD OF REVIEW

 Whether an investigatory stop is supported by reasonable suspicion presents a mixed question of law and fact. *United States v. Garcia–Camacho*, 53 F.3d 244, 245 (9th Cir.1995). While we review mixed questions of law and fact de novo, *United States v. Duarte–Higareda*, 113 F.3d 1000, 1002 (9th Cir.1997), factual determinations underlying this inquiry are reviewed for clear error, *United States v. Garcia–Acuna*, 175 F.3d 1143, 1146 (9th Cir.1999).

## III. DISCUSSION

The Fourth Amendment's prohibition of unreasonable searches and seizures extends to the brief investigatory stop of a vehicle. *See United States v. Brignoni–Ponce,* 422 U.S. 873, 878, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975). Accordingly, an officer may not detain a motorist without "reasonable suspicion." *United States v. Rodriguez,* 976 F.2d 592, 594 (9th Cir.1992), *amended by* 997 F.2d 1306 (9th Cir.1993). Reasonable suspicion consists of "specific, articulable facts which, together with objective and reasonable inferences, form the basis for suspecting that the particular person detained is engaged in criminal activity." *Id.* (citations and internal quotation marks omitted). Reasonable suspicion may not be "based on broad profiles which cast suspicion on entire categories of people without any individualized suspicion of the particular person to be stopped." *United States v. Rodriguez–Sanchez,* 23 F.3d 1488, 1492 (9th Cir.1994), *overruled in part on other grounds by United States v. Montero–Camargo,* 208 F.3d 1122, 1131–32 (9th Cir.), *cert. denied,* 531 U.S. 889, 121 S.Ct. 211, 148 L.Ed.2d 148 (2000).

In the context of stops made near a border, the Supreme Court has identified a non-exclusive set of factors that may be considered in determining whether reasonable suspicion exists: (1) characteristics of the area in which a vehicle is encountered; (2) proximity to the border; (3) usual traffic patterns on the particular road; (3) previous experience with alien traffic; (4) recent illegal border crossings in the area; (5) erratic or evasive driving behavior; (6) aspects of the vehicle; and (7) the behavior or appearance of the driver. *Brignoni–Ponce,* 422 U.S. at 884–85, 95 S.Ct. 2574.

While an officer should consider these factors in light of experience detecting illegal entry and smuggling, "experience may not be used to give the officers

unbridled discretion in making a stop." *Nicacio v. United States INS,* 797 F.2d 700, 705 (9th Cir.1985), *overruled in part on other grounds by Hodgers–Durgin v. de la Vina,* 199 F.3d 1037, 1045 (9th Cir.1999) (en banc). An investigatory stop must be based on facts, not the "mere subjective impressions of a particular officer," *United States v. Hernandez–Alvarado,* 891 F.2d 1414, 1416 (9th Cir.1989), and the inferences drawn by the officer must be objective and reasonable, *United States v. Cortez,* 449 U.S. 411, 418, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981).

Diaz argues that Agent Rodriguez did not have reasonable suspicion to conduct an investigatory stop. Relying primarily on this court's analyses in *United States v. Sigmond–Ballesteros,* 247 F.3d 943 (9th Cir.2001), *superseded by* 285 F.3d 1117 (9th Cir.2002), and *United States v. Arvizu,* 217 F.3d 1224 (9th Cir.2000), *rev'd,* 534 U.S. 266, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002), Diaz argues that his driving behavior, the characteristics of his vehicle, and the suspicion of contraband-laden duffel bags just south of the border, all have innocent explanations; accordingly, he argues, this court may not factor them into its reasonable suspicion analysis.

This argument, however, is unavailing. In *United States v. Arvizu,* 534 U.S. 266, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002), the Supreme Court reaffirmed that the proper reasonable suspicion analysis considers the combination of factors motivating an investigatory stop to determine whether they support a finding of reasonable suspicion under the "totality of the circumstances." 122 S.Ct. at 750. Individual factors that may appear innocent in isolation may constitute suspicious behavior when aggregated together. *United States v. Sokolow,* 490 U.S. 1, 9–10, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989). While some of the factors that led Agent Rodri-

guez to stop Diaz may, when viewed in isolation, be innocently explainable, when viewed in their totality, they create reasonable suspicion of criminal activity.

■ First, Agent Rodriguez's original suspicion of Diaz, while itself insufficient to justify the investigatory stop, was grounded in objectively identifiable facts. Initially, Diaz was on Tierra del Sol Road at a very unusual time. Agent Rodriguez knew from experience that it was unusual to encounter traffic so late in the area; thus, it was understandable that Diaz's presence aroused Agent Rodriguez's suspicion.[1] *See United States v. Tiong*, 224 F.3d 1136, 1140 (9th Cir.2000). Additionally, as Agent Rodriguez testified, Tierra del Sol Road was located in a high-crime area.[2] While Diaz's presence in a high-crime area cannot alone provide reasonable suspicion that he had committed or was about to commit a crime, *Brown v. Texas*, 443 U.S. 47, 52, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979), Agent Rodriguez could consider this fact in forming reasonable suspicion, *Illinois v. Wardlow*, 528 U.S. 119, 124, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000). Finally, Agent Rodriguez encountered Diaz close to the border,[3] shortly after receiving reports that contraband was poised for smuggling into the United States. While the Supreme Court has cautioned that

"[r]oads near the border carry not only aliens seeking to enter the country illegally, but a large volume of legitimate traffic as well," *Brignoni–Ponce*, 422 U.S. at 882, 95 S.Ct. 2574, proximity to the border may be considered as a factor in the reasonable suspicion calculus, *id.* at 884, 95 S.Ct. 2574.

Second, Agent Rodriguez's initial suspicion ripened into reasonable suspicion as he observed Diaz's unusual car and driving behavior. Agent Rodriguez determined that Diaz's vehicle was registered out of the area, and he observed the vehicle slowing and speeding in a manner consistent with a driver who did not know the area. Agent Rodriguez further observed that Diaz's vehicle bounced erratically over small bumps and that the rear of the vehicle appeared raised and the suspension modified, which he knew to be common characteristics of vehicles used for smuggling. While there were potentially innocent explanations for Diaz's unusual car and driving behavior, Agent Rodriguez correctly considered these factors in light of his pre-existing suspicion. Given that Agent Rodriguez's suspicions had already been piqued by objective, particularized facts, and that these suspicions compounded further as Agent Rodriguez followed Diaz, we conclude that the threshold of

1. The dissent's reliance on *Sigmond–Ballesteros, see* dissent at 1145, in which we held that driving at 4:20 a.m. was of little probative value, *see* 285 F.3d at 1125, is misplaced. Unlike Tierra del Sol Road, which is in an isolated area, the highway involved in *Sigmond–Ballesteros* was a major highway used by long-distance commuters who "would ordinarily leave El Centro around that time." *Id.*

2. The dissent takes issue with the fact that this is a high-crime area. *See* dissent at 1145. That, however, is what the district court found: "And in addition, this is an area that's notorious for smuggling ... almost on every shift the Border Patrol apprehends people on a daily basis crossing through this Tierra del Sol area." That finding is not clearly erroneous.

3. The dissent argues that Diaz's conduct was suspicionless because he was "traveling towards the border as if to *leave* the United States, not to enter it." Dissent at 1146. In doing so, it either misconstrues the record or speculates about Diaz's intent. Contrary to the dissent's suggestion, nothing in the record supports that Diaz intended to leave the United States. Moreover, although Diaz was traveling in the general direction of the border (south), that was also the direction of the Makin' Bacon Ranch. And, in fact, Diaz later confirmed to Agent Rodriguez that he was headed for the Makin' Bacon Ranch, which is within one mile of the border.

reasonable suspicion was crossed and that the totality of circumstances justified Agent Rodriguez's investigatory stop of Diaz.

## IV. CONCLUSION

The district court did not err in concluding that, under the totality of the circumstances, Agent Rodriguez reasonably suspected Diaz of criminal activity. Accordingly, we affirm the order of the district court denying Diaz's motion to suppress evidence obtained from Agent Rodriguez's investigatory stop.

**AFFIRMED.**

GRABER, Circuit Judge, concurring.

I concur in the majority opinion. I write separately only to respond to an implication in the dissent that evidence of an immigration violation could be suppressed if reasonable suspicion for the stop were lacking.

One's identity is not a fact that can be suppressed. *United States v. Guzman–Bruno*, 27 F.3d 420, 421–22 (9th Cir.1994). Because the stop of Defendant led directly to no criminal charge, but only to processing for deportation, his identity as a noncitizen turned out to be the only operative fact uncovered during the stop. Thus, the border patrol agent correctly understood the legal effect of a lack of reasonable suspicion; he discovered nothing during the stop that could be suppressed. *See id.* (affirming conviction for being a deported alien found within the United States, notwithstanding an illegal arrest).

FERGUSON, Circuit Judge, dissenting.

I respectfully dissent. Although the majority purports to apply the "totality of the circumstances" test, it fails to examine *all* of the relevant circumstances. Conse-

quently, the majority undermines the fundamental protections guaranteed by the Fourth Amendment. The majority's holding allows an officer to stop any person who is cautiously driving close to the border shortly after midnight. Because of this troubling implication, I must dissent.

The majority determines that the totality of the circumstances gave rise to an objective showing of reasonable suspicion in this case. The majority finds that Agent Rodriguez's suspicion was initially aroused because of the time at which Diaz–Juarez[1] was driving, his presence in a "high-crime" area, his proximity to the border, and earlier reports regarding drug smuggling activity nearby. Maj. Op. at 1142. It then finds that Agent Rodriguez's "initial suspicion ripened into reasonable suspicion" upon observing the characteristics of Diaz–Juarez's 1992 Mercury Grand Marquis, its "out of the area" registration, and his driving behavior. Maj. Op. at 1142.

As stated by the majority, we must examine whether all of the factors, taken together, "sufficed to form a particularized and objective basis" for stopping Diaz–Juarez's vehicle. *United States v. Arvizu*, 534 U.S. 266, 122 S.Ct. 744, 753, 151 L.Ed.2d 740 (2002); *United States v. Sigmond–Ballesteros*, 285 F.3d 1117, 1121 (9th Cir.2002) (amended opinion). A factor does not become irrelevant simply because it is "readily susceptible to an innocent explanation." *Arvizu*, 122 S.Ct. at 751 (noting that "this sort of divide-and-conquer analysis" is impermissible). Logically, then, we must consider all the details surrounding the circumstances of the stop.

The majority omits pertinent details surrounding Diaz–Juarez's stop. Thus, in accordance with the standard set forth in

---

1. While I recognize that the majority refers Defendant/Appellant Benjamin Diaz–Juarez as "Diaz," I will refer to him as "Diaz–Juarez."

*Arvizu,* I will discuss each factor raised by the majority and the erroneous omissions made by it, then determine whether *all* of the circumstances sufficiently support a finding of reasonable suspicion. *See Sigmond–Ballesteros,* 285 F.3d at 1121–26 (utilizing a similar framework for its discussion). Viewing each fact properly in light of all the circumstances, I find that Agent Rodriguez failed to articulate a particularized and objective showing of reasonable suspicion.

## I.

I will discuss each of the following factors in turn: (1) the time of the stop and local traffic patterns, (2) Diaz–Juarez's presence in a "high-crime" area, (3) his proximity to the border and earlier reports regarding drug smuggling activity close to the border, (4) characteristics of the vehicle driven by Diaz–Juarez, (5) the vehicle registration, and (6) his driving behavior.

### A Time of the Stop and Traffic Patterns

The majority states that "Diaz[-Juarez] was on Tierra del Sol Road at a very unusual time." Maj. Op. at 1142. However, Diaz–Juarez was driving at 12:20 a.m.—a time that many would not consider "very unusual." In fact, driving at this hour appears rather normal considering that Tierra del Sol Road is located in a farming and residential community with a 24–hour grocery store, a restaurant, a gas station with a 24–hour deli, and numerous private residences. In addition, the road is within a few miles of a tourist information center, a casino, a resort with ten cabins, and a recreational vehicle park with additional campgrounds.[2]

The majority relies on Agent Rodriguez's statement that there was not typically traffic in the area after midnight. However, the government has presented no other evidence that indicates Diaz–Juarez's travel on Tierra del Sol Road at 12:20 a.m. was suspicious or "very unusual." For this reason, "the time of day has very little, if any, probative value." *Sigmond–Ballesteros,* 285 F.3d at 1125 (finding the fact that the defendant was driving at 4:20 a.m. was of little probative value because there was no evidence of its unusual nature, other than the border patrol agent's statement); *cf. United States v. Tiong,* 224 F.3d 1136, 1140 (9th Cir.2000) (finding that the defendant's turn down a non-direct side road at 5:30 a.m. towards a "reasonably suspected smugglers' rendezvous" and his return "a few minutes later with a new passenger" was "objective and highly suspicious").

### B. Presence in a "High–Crime" Area

The majority also relies on the fact that Tierra del Sol Road is located in a "high-crime" area. Again, the majority relies solely on the testimony of Agent Rodriguez. In his testimony, Agent Rodriguez noted that narcotics had been seized in the area approximately once every two weeks and that illegal aliens were detained daily during the shift change.[3] However, there is no indication in the record that this stop occurred during the shift change.

"The citing of an area as 'high-crime' requires careful examination by the court, because such a description, unless properly limited and factually based, can easily serve as a proxy for race or ethnicity." *United States v. Montero–Camargo,* 208

---

**2.** Diaz–Juarez introduced a brochure for the Live Oak Springs Resort during the suppression hearing. *See generally* Live Oak Springs Resort: Romantic Mountain Getaway, *at* http://www.liveoaksprings.com; Golden Acorn Casino, *at* http://www.goldenacorncasino.com.

**3.** As discussed further below, Agent Rodriguez stopped Diaz–Juarez solely on the suspicion of an immigration violation. Thus, Agent Rodriguez's observations regarding the narcotics smuggling is of lesser relevance.

F.3d 1122, 1138 (9th Cir.2000) (en banc); *see Sigmond–Ballesteros*, 285 F.3d at 1124 (finding that the particular highway was "of only minimal significance" because the agent's general statements regarding the notoriety of the route for smuggling were insufficient to establish its notoriety, and further noting that this "general proposition" was insufficient to establish reasonable suspicion). Specific data, not "mere war stories[,]" are required to establish that an area deserves to be termed a "high-crime area." *Montero–Camargo*, 208 F.3d at 1139 n. 32. This is particularly true with respect to "populated areas" or "areas in which people typically carry on legitimate activities (including areas where people frequently camp or hike)." *Id.* As we emphasized in *Montero–Camargo*, "we must be particularly careful to ensure that a 'high crime' area factor is not used with respect to entire neighborhoods or communities in which members of minority groups regularly go about their daily business . . . ." *Id.; see Sigmond–Ballesteros*, 285 F.3d at 1124.

Agent Rodriguez testified that Tierra del Sol Road "was located in a high-crime area," relying on his speculative observations.[4] Maj. Op. at 1142. This testimony was a far cry from the "specific data" required to support the assertion that the stop took place in a "high-crime" area.[5]

*See id.* In this case, the area where the stop occurred is one in which people carry on daily activities (such as farming, grocery shopping, and dining out) and other legitimate activities (such as gaming, visiting a resort, and camping). Thus, the majority errs by characterizing the area of the stop as a "high-crime" area.[6] *Cf. id.* at 1127, 1138–39 (characterizing a specific stretch of the highway as a "high-crime" area because it was an "isolated and unpopulated spot in the middle of the desert" and could not be observed from the border patrol checkpoint).

### C. Proximity to the Border and Reports Regarding Drug Activity

The majority also notes that Agent Rodriguez's suspicions were raised by Diaz–Juarez's proximity to the border because he had recently received reports that drugs were poised at the border for smuggling. However, the majority overlooks the fact that Agent Rodriguez stopped Diaz–Juarez based solely on his suspicions of a possible immigration violation. Thus, the recent reports regarding possible drug smuggling were of little import. Furthermore, although Diaz–Juarez was in close proximity to the border, Agent Rodriguez stopped him less than a mile from the border, after Diaz–Juarez had been driving *southbound* towards the United

---

4. In fact, Agent Rodriguez was unable to provide an approximate number of arrests that occurred in the specific zone that includes Tierra del Sol Road.

5. The majority asserts that we should defer to the District Court's finding that Tierra del Sol Road is in a "high-crime" area, noting that the finding is not clearly erroneous. Maj. Op. at 1142 n. 2. However, we cannot defer to the District Court's findings when it incorrectly applies the law in reaching these findings. *Sigmond–Ballesteros*, 285 F.3d at 1120, 1124 (finding that the agent's general statements were insufficient to establish that the area was notorious for alien smuggling, even though the district court had found that the

stop occurred in "an area known for alien smuggling"). Here, the District Court failed to "examine with care the specific data underlying [the] assertion[,]" merely relying on Agent Rodriguez's war stories. *Montero–Camargo*, 208 F.3d at 1139 n. 32.

6. Even assuming the majority's characterization is accurate, "an individual's presence in a high crime area is *not* enough to support reasonable, particularized suspicion that the individual in question has committed or is about to commit a crime." *Montero–Camargo*, 208 F.3d at 1138 (citing *Brown v. Tex.*, 443 U.S. 47, 52, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979)).

States–Mexico border for at least five miles. It is hard to believe that one's suspicion could be reasonably aroused for possible illegal entry or alien smuggling when the driver is traveling towards the border as if to *leave* the United States, not to enter it.[7] Thus, both of these factors should be given little probative value.

### D. Characteristics of the Vehicle

Another factor raised by the majority is Agent Rodriguez's observations that Diaz–Juarez's car bounced erratically over small bumps and that the rear of the vehicle appeared to be raised and the suspension modified. Aspects of a vehicle may be taken "into account in deciding whether there is reasonable suspicion to stop a car in the border area." *United States v. Brignoni–Ponce*, 422 U.S. 873, 884–85, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975). However, even assuming that the car driven by Diaz–Juarez bounced erratically and its suspension appeared raised,[8] these modifi-

cations are not dispositive as to the reasonableness of Agent Rodriguez's suspicion. *See United States v. Rodriguez*, 976 F.2d 592, 595 (9th Cir.1992) (finding no reasonable suspicion even though the agents observed that the car appeared to be "heavily loaded" and "kind of floated" over bumps in the road), *amended by* 997 F.2d 1306 (9th Cir.1993) (amendments not relevant to discussion); *see also United States v. Garcia–Camacho*, 53 F.3d 244, 246 (9th Cir.1995) (finding no reasonable suspicion even though the agent observed that the truck appeared "heavily ladened based on the way it reacted to bumps").

### E. Vehicle Registration

The majority also cites Agent Rodriguez's determination that Diaz–Juarez's car was registered "out of the area," as one of the factors supporting reasonable suspicion. Maj. Op. at 1142. This characterization is misleading. The car was registered in Chula Vista. Chula Vista is

---

7. The majority argues that I either misconstrue the record or speculate about the intent. Maj. Op. at 1142 n. 3. However, the record clearly establishes the fact that Diaz–Juarez was driving southbound for approximately five miles. I do not state that Diaz–Juarez actually intended to leave the United States. Rather, I merely discuss the inferences that can be drawn from this fact. From these inferences, I reach the conclusion that this fact seems somewhat incongruous with someone intending to illegally enter or bring others illegally into the country.

In support of its argument, the majority points to the fact that Diaz–Juarez did not intend to leave the United States as evidenced by his statement to Agent Rodriguez after the stop. Maj. Op. at 1142 n. 3. However, the majority incorrectly relies on evidence discovered *after* the stop occurred. In evaluating the totality of the circumstances, we must look at the circumstances that led to the stop. Adoption of the majority's newly-created standard, i.e., evidence after the stop may be considered in the reasonable suspicion analysis, would destroy any protection left under the totality of the circumstances test.

If we were to apply this erroneous standard to the present case, we would also need to consider the fact that Agent Rodriguez rewrote his report a month subsequent to the stop, after an attorney and agent from the DEA asked him to supplement his report because they needed more information. The original report stated that the factors Agent Rodriguez considered before the stop were: (1) the driver's unfamiliarity with the area, (2) the car's changing of speeds, and (3) the car's erratic bouncing over very small road bumps. However, the rewritten report added the following factors: (1) the reports of drug smuggling activities, (2) the alteration to the car's suspension, and (3) the vehicle registration. If we consider post-stop evidence, which we must under the majority's standard, we could infer that these changes were an attempt to "cook the books."

8. Unfortunately, we cannot verify whether the car had been modified. The government does not know what happened to the car after the Drug Enforcement Agency ("DEA") chose not to seize it. Thus, Diaz–Juarez's attorney has not been given the opportunity to examine the car.

located approximately 75 miles from where the stop occurred. In fact, it is one of several major cities located in the vicinity and can be easily reached via the Interstate 8 freeway. Thus, a car registered in Chula Vista would not appear extraordinary, but rather a part of the legitimate, daily traffic traversing Tierra del Sol Road.

In addition, even if the majority is correct in characterizing Chula Vista as "out of the area," it accords this fact an excessive amount of probative weight. None of our previous cases cited this fact in such a manner. We have previously held that a lack of valid registration or license gives rise to reasonable suspicion that criminal activity is afoot. *See, e.g., United States v. Perez,* 37 F.3d 510, 514 (9th Cir.1994). Outside of this context, we have only given probative weight to vehicle registration when it appeared suspicious when viewed in direct concert with other facts or circumstances. *See Montero–Camargo,* 208 F.3d at 1139 (finding that, when a tip had recently been received about two cars with Mexican license plates that would make a U-turn before the checkpoint and when two cars with Mexican license plates later appeared and were driving in tandem, both the "tandem driving" and the Mexican plates could be given some "direct weight," even though neither constituted "substantial factors, either singly or together."). In *Arvizu,* the Supreme Court indicated that the fact that a car was registered to an address nearby an area notorious for alien and drug smuggling is relevant to our reasonable suspicion determination. 122 S.Ct. at 749. However, in its analysis, the Court did not give this fact much probative value. *Id.* at 753 (omitting this factor from its reasonable suspicion analysis and noting that "some factors may be more probative than others").

Agent Rodriguez did not testify that he believed that the car lacked valid registration or that the car had been stolen.[9] In addition, there were no other facts, such as the tip in *Montero–Camargo,* that were acting in direct concert with the fact that the car was registered in Chula Vista. Finally, Agent Rodriguez did not believe the registration was suspicious because the address in Chula Vista was located in an area notorious for drug and alien smuggling. Rather, he merely found it suspicious because it was registered "out of the area," even though Chula Vista was a mere 75 miles away. Thus, although we are required to consider all of the facts and circumstances under the totality of the circumstances test, we should give this factor, i.e., a car registered and driven in California, little probative weight. *See United States v. Jimenez–Medina,* 173 F.3d 752, 755 (9th Cir.1999) (noting that the defendant's truck registration in Arizona when the stop occurred in Arizona was not suspicious because the truck was "legally registered and properly licensed").

## F. Driving Behavior

The majority relies on Agent Rodriguez's observation that the vehicle was "slowing and speeding in a manner consistent with a driver who did not know the area." Maj. Op. at 1142. However, the majority omits other relevant circumstances regarding the factor. In particular, Tierra del Sol Road is unlit and contains numerous curves, including one that is at a 90–degree angle. Given the nature of the road, it is not surprising that Diaz–Juarez would slow down and speed up, as he navigated his way down Tierra del Sol Road. Moreover, as discussed above, legitimate traffic such as tourists, campers, and visitors interested in the casino would like-

---

9. Moreover, Agent Rodriguez had called dispatch to verify the license plate, at which time he discovered that the car was registered in Chula Vista.

**1148**

ly proceed with caution in driving down such a road.

"The law of this circuit teaches us that the presence of such facts as driver preoccupation, slow speed, movement within one's own lane of traffic, and even coming from the wrong neighborhood do not give rise to legally sufficient 'reasonable suspicion.'" *Jimenez–Medina*, 173 F.3d at 755. We have "frowned on speed of the vehicle as a basis for reasonable suspicion ...," pointing out that the government has argued both increases and decreases in speed constitute 'suspicious' conduct, creating a 'heads I win, tails you lose' trap for drivers who do ·not maintain constant speed." *Id.* (quoting *Garcia–Camacho*, 53 F.3d at 247); *see also Sigmond–Ballesteros*, 285 F.3d at 1122 ("We are unwilling to place [cautious] motorists in a 'damned if you do, equally damned if you don't' situation.") (quoting *Montero–Camargo*, 208 F.3d at 1136).

The record does not establish the speed at which Diaz–Juarez was driving or the speed to which he decelerated or accelerated.[10] In addition, the record does not reveal whether these fluctuations occurred during curves or straightaways. Accordingly, although we must consider this factor, it should be given little probative weight. Otherwise, we would punish drivers for proceeding cautiously on dark, unlit, curvy roads, placing them in an impermissible "lose-lose" situation. *See Sigmond–Ballesteros*, 285 F.3d at 1122; *Jimenez–Medina*, 173 F.3d at 755.

## II.

With the full circumstances of the case now discussed, I will address these factors in sum under the "totality of the circumstances" test. *See Arvizu*, 122 S.Ct. at 751–52. Diaz–Juarez was traveling southbound on Tierra del Sol Road at 12:20 a.m. Agent Rodriguez's suspicions were allegedly aroused because residents of the community were generally not out at that time. However, a sufficient number of residents were apparently out in the late evenings to provide enough business for a 24–hour grocery store and a 24–hour deli in the area. Also, visitors stayed at the resort, went to the casino, and camped nearby. Agent Rodriguez considered it a "high crime" area because of illegal alien crossings and smuggling activities that had occurred in the vicinity. In addition, he had recently heard reports that contraband was dropped off in an area immediately south of the border.

However, upon observing Diaz–Juarez, Agent Rodriguez did not suspect him of smuggling drugs. He suspected Diaz–Juarez was involved in some type of immigration violation because of the alleged modifications to the car, i.e., the rear was raised and the suspension was modified. He also thought that the registration was suspicious because it was from Chula Vista, a city located 75 miles away. Moreover, Agent Rodriguez believed that the Diaz–Juarez's deceleration and acceleration suggested a driver who was unfamiliar with the area. He found this driving behavior suspicious, despite the nature of the road and the fact that visitors stayed at the resort and patronized the local casino. Finally, it is worth noting that Agent Rodriguez believed an illegal alien could be pulled over for an immigration violation, even if there was no reason to make the stop.[11]

---

**10.** During the suppression hearing, Agent Rodriguez admitted that he did not know the speed limit on Tierra Del Sol Road.

**11.** In her concurrence, Judge Graber asserts that I imply that "evidence of an immigration

violation [in particular one's identity] could be suppressed if reasonable suspicion for the stop were lacking." Concurring Op. at 11949. It appears that this assertion is based on my recitation of the fact that Agent Rodriguez did not believe that reasonable suspicion

These factors considered in their totality did not suffice to form a particularized and objective basis for Agent Rodriguez's stop of Diaz–Juarez. *See Rodriguez,* 976 F.2d at 596. In *Rodriguez,* we considered whether the following factors amounted to a showing of reasonable suspicion: (1) location of the incident on a highway in a high crime area; (2) the lack of acknowledgment or eye contact between the suspect and the agents; (3) the type of car; (4) the characteristics of the car (i.e., it appeared to be weighed down in the rear); and (5) the driving behavior of the defendant (i.e., driving attentively and cautiously). *Id.* We found that these factors were insufficient to establish reasonable suspicion. *Id.; see also Garcia–Camacho,* 53 F.3d at 246 (finding no reasonable suspicion when the passenger looked at the agent with a "surprised" and "terrified" look, the truck was delayed in pulling over, and other factors almost identical to those discussed in *Rodriguez* ); *cf. United States v. Rodriguez–Sanchez,* 23 F.3d 1488, 1493 (9th Cir.1994) (finding reasonable suspicion existed for the stop because certain facts distinguished the case from *Rodriguez,* including the defendant's rapid exit from the border checkpoint and sudden weaving across lanes without signaling), *overruled in part on other grounds by Montero–Camargo,* 208 F.3d at 1134 n. 22.

The majority relies in part on Agent Rodriguez's experience to justify the weight it accords these factors. However, this experience cannot overcome the sum of the factors, which do not amount to reasonable suspicion. "Although law enforcement officials are entitled to assess the facts in light of their experience, experience may not be used to give the officers unbridled discretion in making a stop." *Sigmond–Ballesteros,* 285 F.3d at 1126 (citations and internal quotation marks omitted).

Accordingly, the factors considered in their totality are insufficient to establish reasonable, particularized suspicion in this case. *See Rodriguez,* 976 F.2d at 596. Here, Agent Rodriguez saw a man in an older car with a possibly modified suspension slowing down and speeding up while driving southward toward the United States–Mexico border on a curvy, unlit road, shortly after midnight. *See Sigmond–Ballesteros,* 285 F.3d at 1127 (holding that reasonable suspicion was not established by the facts that a man driving a large pick-up truck at 4:20 a.m. in an alleged high-crime area close to the border). This profile could fit "hundreds or thousands of law abiding daily users" of the roads in Southern California. *Rodriguez,* 976 F.2d at 596. As we recently warned, "[this] 'profile' depicts 'a very large category of presumably innocent travelers, who would be subject to virtually random seizures were the Court to conclude that as little foundation as there was in this case could justify a seizure.' " *Sigmond–Ballesteros,* 285 F.3d at 1127 (quoting *Reid v. Ga.,* 448 U.S. 438, 441, 100 S.Ct. 2752, 65 L.Ed.2d 890 (1980) (per curiam)). This is exactly what the majority has done here. Because of its holding, hundreds of innocent travelers and some residents can and probably will be subject

---

was necessary for a stop. Judge Graber misconstrues my argument. From our caselaw, it is clear that one's identity cannot be suppressed. *See United States v. Guzman–Bruno,* 27 F.3d 420, 422 (9th Cir.1994). However, other evidence, such as Diaz–Juarez's statement to Agent Rodriguez that he was on his way to the Makin' Bacon Ranch, can and

should have been suppressed because they arose from an illegal stop. Thus, although Diaz–Juarez's identity cannot be suppressed and he should have been removed from the country, the evidence regarding his criminal charges should have been suppressed as fruits of the poisonous tree.

to seizures for driving late at night in an old car, close to the border. Unfortunately, many of the travelers will be racial or ethnic minorities, particularly those of Latin or Spanish descent. *See Montero–Camargo,* 208 F.3d at 1131–35 (discussing the growing Hispanic population in the United States, particularly in the border states, and holding that "Hispanic appearance . . . may not be considered as a relevant factor where particularized or individualized suspicion is required.").

Under *Arvizu,* we cannot pick and choose which factors to consider. 122 S.Ct. at 751. At the same time, a multitude of minimally probative factors cannot meet the requirements of reasonable suspicion, i.e., "a particularized and objective basis for suspecting the particular person stopped of criminal activity." *Rodriguez,* 976 F.2d at 594; *see Arvizu,* 122 S.Ct. at 750. Here, the majority has made "much ado about nothing," creating reasonable suspicion out of many little nothings. When the totality of all the circumstances creates nothing that involves reasonable suspicion of criminal activity, then to hold otherwise violates the fundamental protections guaranteed by the Fourth Amendment. Moreover, it is worth repeating that, in this case, the agent testified under oath at the suppression hearing that he believed an illegal alien could be pulled over for an immigration violation, even if there was no reason to make the stop. For the reasons stated above, I must dissent.