**[J-7-2023] [OISA: Brobson, J.]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**EASTERN DISTRICT**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | No. 24 EAP 2022 |
| | : | |
| Appellee | : | Appeal from the Judgment of |
| | : | Superior Court entered on December |
| | : | 21, 2021 at No. 560 EDA 2021 |
| v. | : | (reargument denied February 16, |
| | : | 2022) vacating and remanding the |
| | : | Order entered on February 11, 2021 |
| KEVIN JACKSON, | : | in the Court of Common Pleas, |
| | : | Philadelphia County, Criminal |
| Appellant | : | Division at No. CP-51-CR-0000888- |
| | : | 2020 |
| | : | |
| | : | ARGUED: March 8, 2023 |

**OPINION IN SUPPORT OF REVERSAL**

**JUSTICE DONOHUE**                                    **DECIDED: September 28, 2023**

As the trial court concisely stated: "All we have here is an individual on the street, engaging in running, and he – and with good reason because there had been shots fired." N.T., 2/11/2021, at 52. I join Justice Wecht's Opinion in Support of Reversal ("OISR").

Because the Commonwealth in this case insists that we bless reliance on the notion of "high-crime" areas as a factor in our search and seizure jurisprudence, and that we consider it in this case notwithstanding the trial court's contrary finding, Commonwealth's Brief at 11, 16-18, I write to highlight that its importance is often overused and misunderstood. The designation of a neighborhood as "high-crime" creates a vast inequality in the level of privacy afforded individuals based on where they

find themselves.[1]  I recognize that when applying the Fourth Amendment, "officers are not required to ignore the relevant characteristics of a location in determining whether the circumstances are sufficiently suspicious to warrant further investigation."  *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000); *see also,* Opinion in Support of Affirmance ("OISA") at 26, n.16 (leaving open the possibility that the difference, though it says nothing about you as an individual fleeing from danger, would tip the scales toward allowing an officer to seize you, while also noting that the factor has garnered criticism).

Nonetheless, the Fourth Amendment's requirement of particularized and individualized suspicion demands more than incantation of "high-crime area."  It is critical that courts and practitioners in this area of the law be cognizant of the burden that rests with the Commonwealth to justify a warrantless search or seizure when it seeks to do so based upon a "high-crime area."[2]  Significantly, for the Commonwealth to successfully invoke "high-crime area" as a factor that weighs into a reasonable

---

[1]  Then-Justice Baer's concurring opinion in *Commonwealth v. Thompson*, 985 A.2d 928, 944-45 (Pa. 2009) (Baer, J., concurring) lamented the long-term consequences of consideration of high-crime neighborhood.  He stated that the unfortunate result of that decision was that "the low socio-economic character of a neighborhood" would "be enough to suffice the rigorous standards of probable cause for any citizen" despite that "the rights of Pennsylvania residents in both high-crime and low-crime areas remain the same under our Constitution."  *Id*.

[2]  "[S]earches and seizures conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment – subject only to a few specifically established and well delineated exceptions."  *Minnesota v. Dickerson*, 508 U.S. 366, 372 (1993).  "The exceptions are 'jealously and carefully drawn' and there must be a 'showing by those who seek exemption … that the exigencies of the situation made that course imperative.'"  *Coolidge v. New Hampshire*, 403 U.S. 443, 455 (1971) (quoting *Jones v. United States*, 357 U.S. 493, 499 (1958) and *McDonald v. United States*, 335 U.S. 451, 456 (1948)).

suspicion analysis, it must do more than present testimony of a witness who will utter the words.

First, the Commonwealth must present evidence to support its assertion of the designation. That is, where the existence of reasonable suspicion depends in any meaningful way on the characteristic of a neighborhood as being a disproportionately crime-ridden neighborhood, the Commonwealth bears the burden of proving that there is, in fact, significant crime occurring in that neighborhood. For instance, if the Commonwealth seeks to characterize a neighborhood as having "high-gun-crime," it cannot merely call a witness to intone the words as it did here.[3] Relatedly, as Justice Dougherty astutely observes, even asserting a "large increase in gun violence" is meaningless. *See* OISR at 11 n.4 (Dougherty, J.) (explaining that a "large increase in gun violence" does not mean the same thing as "high-crime" because a large percentage increase in shootings could merely indicate that there is one as opposed to zero shootings, and one shooting cannot fairly be characterized as "high-crime"). Without explaining and quantifying the assertion and comparing it to other areas, the

---

[3] The testimony and argument from the suppression hearing reveal the superficiality of the Commonwealth's assertions here. The prosecutor inquired about the officer's familiarity with the "4900 area of North Penn Street[,]" and the officer stated that he was "pretty familiar" and that he receives "daily intel reports of every district every week." N.T., 2/11/2021, at 20. Asked to characterize the area of the incident, the officer answered, "There's been a large increase in gun violence in the last few years in that area." *Id.* That was the entire exchange.

Though there was no evidence presented to support or rebut the officer's bald assertion, he was cross-examined about it. On cross-examination, Jackson's counsel inquired: "[Y]ou made mention of there being a large increase in gun violence in this particular area… So what's the increase? What's the [sic] percentage has it increased, sir?" *Id.* at 23. The officer responded, candidly, "I wouldn't know. I would have to had [sic] those intel reports." *Id.* at 23-24. The Commonwealth presented no evidence to support the officer's assertion that there was a large increase in gun violence.

incantations of "high-crime area" or "high-gun crime" or "high-drug crime" are hollow. *See United States v. Montero-Camargo*, 208 F.3d 1122, 1143 (9th Cir. 2000) (Kozinski, J., concurring) ("[T]o rely on every cop's repertoire of war stories to determine what is a 'high crime area' – and on that bases to treat otherwise innocuous behavior as ground for reasonable suspicion – strikes me as an invitation to trouble. … I would be most reluctant to give police the power to turn any area into a high crime area based on their unadorned personal experiences.").

Scholars and judges have rightfully criticized courts for failing to require that the designation be "empirically supported with factual evidentiary proof." *See* Andrew Guthrie Ferguson & Damien Bernache, *The "High Crime Area" Question: Requiring Verifiable and Quantifiable Evidence for Fourth Amendment Reasonable Suspicion Analysis*, 57 Am. U. L. Rev. 1587, 1591 (2008). Professor Andrew Guthrie Ferguson, a national expert on predictive policing, wrote with his colleague to modestly propose that courts use an "objective, quantifiable approach to a high-crime area designation." *Id*. at 1628-34. They insist that the central question must focus on whether an area is "disproportionately affected by criminal activity[,]" not merely whether an officer testifies subjectively that he would characterize the area as "high-crime." *Id*. at 1629.

The Ninth Circuit Court of Appeals shared this concern when it stated that "more than mere war stories are required to establish the existence of a high-crime area." *United States v. Montero-Camargo*, 208 F.3d 1122, 1139 n.32 (9th Cir. 2000).[4] That

---

[4] In *Montero-Camargo*, the Ninth Circuit Court of Appeals ultimately concluded that reasonable suspicion was supported, in part, by the fact that the defendant's conduct occurred in a certain location, but it was because of the uniqueness of the defendant's conduct in the barren desert on the side of the highway. *Montero-Camargo*, 208 F.3d at 1138-39. The court clarified that its reliance on the location was "conditioned on the unique circumstances of the locale." *Id*. at 1139 n.32.

court instructed reviewing courts to "examine with care the specific data underlying any such assertion." *Id*. *See similarly, United States v. Diaz-Juarez*, 299 F.3d 1138, 1145 (9th Cir. 2002) (Ferguson, J., dissenting) (stating that an officer's speculative observations are "a far cry" from the specific data required to support an assertion that a stop occurred in a "high-crime" area).

Second, and in addition to proving that the neighborhood is disproportionately affected by the criminal activity, the Commonwealth must demonstrate that the criminal activity is relevant to the officer's suspicions. Evidence is relevant if "it has any tendency to make a fact more or less probable than it would be without the evidence;" and "the fact is of consequence in determining the action." Pa.R.E. 401(a) & (b). Courts are to evaluate relevance based on "reason, experience, scientific principles and the other testimony offered in the case." *Id*., cmt. For those who doubt that relevance is foundational in this context, I point out that the United States Supreme Court has likewise required the government to establish the relevance of its "high-crime" assertion.

In *Brown v. Texas*, 443 U.S. 47 (1979), the Court clarified the *Terry* test, pulling back on the states straying from requiring the specific, individualized suspicions *Terry* envisioned, in a case that touched on this concept of "high-crime area." In *Brown*, the Court considered the application of a Texas statute which made it a criminal act to refuse to give one's name and address to an officer "who has lawfully stopped him and requested the information." *Id*. at 49 (citing Texas Penal Code § 38.02(a) (1974)). The statute was used to justify detaining and requiring the appellant to identify himself.

The Court recounted the officer's testimony offered in support of reasonable suspicion: he and his partner were cruising in a patrol car at 12:45 in the afternoon; they observed the appellant and another individual walking in opposite directions away from one another in an alley; and they believed that the two "had been together or were

about to meet until the patrol car appeared." *Id*. at 48. One of the officers testified that the situation in the alley "looked suspicious," but he could not point to any facts supporting his conclusion. *Id*. at 51-52. The officer exited the vehicle and asked the appellant to identify himself and explain his presence in the alley. When the appellant refused to identify himself, he was arrested for violating the Texas statute. *Id*. at 49 (citing Texas Penal Code § 38.02(a) (1974)).

Addressing the legality of the seizure, the Court reiterated the reasonable suspicion standard: the officers must "have a reasonable suspicion, based on objective facts, that the individual is involved in criminal activity." *Id*. at 51. In finding that the seizure violated the Fourth Amendment, the Court carefully addressed the characteristics of the situation in which the appellant found himself:

> There is no indication in the record that it was unusual for people to be in the alley. The fact that appellant was in a neighborhood frequented by drug users, standing alone, is not a basis for concluding that appellant himself was engaged in criminal conduct. In short, the appellant's activity was no different from the activity of other pedestrians in that neighborhood.

*Id*. at 52. Thus, *Brown* prudently advises that presence in a certain type of neighborhood alone is not enough to suspect an individual of criminal conduct, unless the government demonstrates the connection (i.e., the relevance) of conduct in relation to the neighborhood characteristic. By distinguishing from circumstances where an individual is acting unusually or differently than those around him, the Court drew attention to the requirement that reasonable suspicion be based on facts specific to the individual's conduct. Reasonable suspicion cannot be based on generalities about where an individual finds himself. "When such a stop is not based on objective criteria, the risk of arbitrary and abusive policy practices exceeds tolerable limits." *Id*.

Twenty-one years later, the United States Supreme Court once again addressed the "high-crime neighborhood" factor. In *Illinois v. Wardlow*, 528 U.S. 119 (2000), Chicago Police officers driving in a four-car caravan policing an "area known for heavy narcotics trafficking" came upon an area where they "expected to find a crowd of people … including lookouts and customers." *Id*. at 121. The caravan approached the suspected area, passing Wardlow standing next to a building holding an opaque bag. Wardlow looked in the direction of the officers and then fled. Officers then chased down Wardlow and performed a "protective pat down search for weapons because in [the officer's] experience it was common for there to be weapons in the near vicinity of narcotics transactions." *Id*. at 122. The pat down search led officers to discover an unlawful firearm. Wardlow challenged whether the circumstances leading to the pat down search established reasonable articulable suspicion.

The Court, after reiterating its oft-stated language from *Terry* that "[t]he officer must be able to articulate more than an 'inchoate and unparticularized suspicion or hunch' of criminal activity[,]" found that the standard was met. *Id*. at 123-24 (citing *Terry*, 392 U.S. at 27). Amongst other things, the Court clarified how the characteristics of the neighborhood played into its totality of the circumstances analysis. It first reiterated *Brown*'s rejection of "high-crime neighborhood" as a standalone basis for "reasonable, particularized suspicion that the person is committing a crime." *Id*. at 124 (citing *Brown*, 443 U.S. 47). Nonetheless, the Court elucidated, "officers are not required to ignore the relevant characteristics of a location in determining whether the circumstances are sufficiently suspicious to warrant further investigation." *Id*. It cited *Adams v. Williams*[5] and explained, "we have previously noted the fact that the stop

---

[5] Just four years after *Terry v. Ohio*, 392 U.S. 1 (1968), *Adams v. Williams*, 407 U.S. 143 (1972) introduced "high-crime area" into our lexicon. At 2:15 a.m., in Bridgeport, Connecticut, an officer "on car patrol duty in a high-crime area" was received a tip from (continued…)

occurred in a 'high crime area' among the relevant contextual considerations in a *Terry* analysis." *Id*. (citing *Adams v. Williams*, 407 U.S. at 143, 144, 147-68). Wardlow's presence in an area of heavy narcotics trafficking combined with his unprovoked flight upon noticing the police aroused the officers' reasonable articulable suspicion. *Id*.

_____

(…continued)

a person known to the officer that "an individual seated in a nearby vehicle was carrying narcotics and had a gun at his waist." *Adams*, 407 U.S. at 144-45. The officer approached the nearby vehicle to investigate. He tapped on the car window and asked the occupant (Williams) to open the door. When Williams rolled down the window instead, the officer reached into the car and removed a firearm from Williams' waistband. The gun was not visible to the officer, but it was in the exact location indicated by the informant. *Id*. Williams was arrested for unlawful possession of the firearm. *Id*.

The *Adams v. Williams* opinion focuses largely on the informant's unverified tip, considering how under the probable cause standard, the Court's decisions indicate that unverified tips may be insufficient for a narcotics arrest or search warrant. *Id*. at 147. Clarifying, the Court condoned consideration of the verified tip for purposes of the reasonable suspicion calculation. Then, in a passage restating the totality of the circumstances analysis, the Court again mentioned the type of neighborhood where the search occurred:

> While properly investigating the activity of a person who was reported to be carrying narcotics and a concealed weapon and who was sitting alone in a car in a **high-crime area** at 2:15 in the morning, [the officer] had ample reason to fear for his safety. When Williams rolled down his window, rather than complying with the policeman's request to step out of the car so that his movements could more easily be seen, the revolver allegedly at Williams' waist became an even greater threat. Under these circumstances the policeman's action in reaching to the spot where the gun was thought to be hidden constituted a limited intrusion designed to insure his safety, and we conclude that it was reasonable.

*Id*. at 147-48 (emphasis added). *Adams v. Williams* thus casually introduced the term into our Fourth Amendment jurisprudence by mentioning it in a case that was otherwise focused on another reasonable suspicion factor.

Thus, under the Fourth Amendment, an officer may consider the "**relevant characteristics** of a location in determining whether the circumstances are sufficiently suspicious to warrant further investigation[.]" *Wardlow*, 528 U.S. at 128 (emphasis added). This consideration presupposes that the government has demonstrated relevance.

Recently, a majority of this Court pushed back against the dangerous practice of baldly invoking "high-crime area" without proving its relevance. In an opinion authored by then-Chief Justice Baer, in *Commonwealth v. Barr*, 266 A.3d 25, 44 (Pa. 2021), we found that where troopers simply stopped a vehicle for a minor traffic violation and then smelled marijuana, and where troopers did not witness the occupants in the vehicle engage in any suspicious conduct, "it [was] of no moment whether the area in which the stop occurred is known as a 'high crime area.'" Again, assertions of "high-crime area" must be accompanied by a showing of relevance.

Forty years ago, Professor Sheri L. Johnson (an expert in the interface of race and criminal procedure) captured the issue well when she stated that, absent a connection between the prevalent crime and the suspected crime, "a 'crime-prone' neighborhood does not increase the probability that a particular crime is being committed." Sheri L. Johnson, *Race and the Decision to Detain a Suspect*, 93 YALE L.J. 214, 222 n.42 (1983). She provided a useful illustration: in a state where sodomy was illegal, a gay community could have been accurately characterized as "high-crime," but that would be irrelevant if the suspected crime was a drug transaction. Courts need not blindly accept the invocation of "high-crime neighborhood" as if proof that there is a lot of crime in a neighborhood proves that there is reasonable suspicion to believe that this individual is involved in the suspected criminal activity.

By contrast, imagine a neighborhood where there is a significant and disproportionate graffiti problem. Where an officer sees a woman walking from a large cement wall with a spray-paint can hanging out of her pocket, the characteristic of this neighborhood reasonably informs the officer's view of the woman. Though it may be inaccurate, the officer may nonetheless consider the characteristic of this neighborhood when forming his suspicions about her conduct. Seeing the same woman walk away from a paint store in another neighborhood with a spray-paint can in her pocket carries entirely different meaning and would render an officer's suspicion that she is engaged in graffiti far less reasonable.

Returning to the case before us, in addition to failing to establish an evidentiary record in this case, supra note 3, the Commonwealth also made no effort to connect the dots to show how the neighborhood's characteristics conveyed information about Jackson's conduct. The Commonwealth repeatedly insisted that it was a "high-crime" area because of gun violence,[6] without explaining how that was relevant to its assertion that there existed reasonable individualized suspicion that Jackson was engaged in criminal activity. Ultimately, the trial court never got to the relevance question because it found that the evidence didn't support the "high-crime" area proposition.

If we assume for the purpose of analysis that the Commonwealth established with empirical evidence that the area where Jackson was stopped constituted an area known for disproportionately regular gun violence, that evidence would not be relevant because it does not tend to make it more probable that Jackson was engaged in gun

---

[6] "This officer is very well aware he's in a high-crime area where there's a lot of gun violence[,]" N.T., 2/11/2021, at 44; "[i]t's a high-crime area. There's gun violence[,]" *id*. at 44; "it's a high-crime area[,]" *id*. at 45; "There is case law th[at] states that being in a high-crime area, gunshots, Your Honor, the defendant fleeing from the officer, that's all indicative of criminal activity." *id*. at 49.

violence. A person in an area known for gun violence is at least as likely to run away from the sound of gun shots as a person in an area not known for gun violence. Contrary to the Commonwealth's argument,[7] the Fourth Amendment requires the government to explain how reasonable suspicion relates to the individual's conduct taking place in the location or area, for instance, by showing that his conduct was unique and, therefore, suspicious. See, e.g., *Brown*, 443 U.S. at 52 (finding that the characteristics of the neighborhood were irrelevant because there was "no indication … that it was unusual for people to be in the alley[]" and "the appellant's activity was no different from the activity of other pedestrians in that neighborhood[]"). Here, there is nothing unusual or unique about running from the sound of gun fire, high-gun violence area or not.

Troublingly, the Commonwealth is of the impression that an officer can tip the scales toward reasonable suspicion by simply intoning the mantra "high-crime area," an impression directly in opposition to the requirement that reasonable suspicion be supported by specific and articulable facts. *Brown*, 443 U.S. at 51-52. Any blessing of intonations of "high-crime area" unsupported by empirical evidence and unconnected to the specific circumstances is a blot on our jurisprudence in this area of Fourth Amendment jurisprudence.

I join Justice Wecht's opinion in support of reversal.

Justice Wecht joins this opinion in support of reversal.

---

[7] According to the Commonwealth, the character of the neighborhood sheds light on whether a person's conduct is or is not linked to criminal activity. Commonwealth's Brief at 18.